HELLENIC LINES, LTD., Libellant,

v.

S.S. UNION METROPOLE and International Union Lines, Inc., Respondents.

HELLENIC LINES, LTD., Libellant and Cross-Respondent,

v.

SINCLAIR REFINING COMPANY, Respondent and Cross-Libellant.

Nos. 7992 and 8072.

United States District Court
E. D. Virginia,
Norfolk Division.

July 2, 1962.

Dow & Stonebridge (Wm. P. Hepburn), New York City, David H. Batchelder, Norfolk, Va., for Hellenic Lines.

Hugh S. Meredith (Vandeventer, Black, Meredith & Martin), Norfolk, Va., for International Union Lines.

Seawell, McCoy, Winston & Dalton (Harry E. McCoy), Norfolk, Va., Burlingham, Hupper & Kennedy (Stanley R. Wright), New York City, for Sinclair Refining Co.

WALTER E. HOFFMAN, Chief Judge.

These actions, consolidated for trial, involve a collision between the motor ship HOLLANDIA, owned and operated by the libellant and cross-respondent, Hellenic Lines, Ltd., and the tanker AM-TANK, with Sinclair Refining Company being the owner *pro hac vice*, on the evening of August 12, 1958, in the vicinity of Overfalls Lightship near the mouth of the Delaware Bay. The dry cargo vessel UNION METROPOLE, owned by In-

ternational Union Lines, Inc., is a party to one action instituted by Hellenic Lines, Ltd., although the UNION METROPOLE did not come into physical contact with either of the other vessels.

Upon the evidence presented and after considering the argument of proctors, the court makes the following findings of fact:

1. The steamship HOLLANDIA is a Greek merchant vessel owned by Hellenic Lines, Ltd., and is 350 feet in length, powered by diesel motors giving a full sea speed of approximately 14 knots.

2. The tanker AMTANK is an American vessel, single screw, powered by 13,-400 H. P. steam turbine engines, capable of a maximum speed of about 15 knots. At all times pertinent hereto, Sinclair Refining Company was the owner *pro hac vice* of said vessel.

3. The dry cargo vessel UNION METROPOLE flies the flag of Liberia and is owned by International Union Lines, Inc., of Hong Kong. It is known as a "Canadian Liberty" vessel, of approximately 7400 gross tons, with a single propeller and powered by a 2500 H. P. steam reciprocating engine, with a maximum cruising speed of approximately 10 knots.

4. The UNION METROPOLE sailed from Philadelphia at 1230 hours on August 12, 1958, bound for Holland with a cargo of approximately 10,000 tons of coal. One MacInnis, a Delaware River pilot, took the UNION METROPOLE from Philadelphia to the Pilot Station at the entrance of the Delaware Bay. He left the UNION METROPOLE at 2210 hours. Prior to his leaving the UNION METROPOLE was turned to port to make a lee for the pilot launch, and the launch thereafter took MacInnis directly to the pilot boat.

5. There were two other outbound vessels astern of the UNION METROPOLE. The HOLLANDIA followed the UNION METROPOLE and the LUFIRA was astern of the HOLLANDIA. Dorsey, the pilot of the LUFIRA, noticed the lights of the UNION METROPOLE and, at the time he left the LUFIRA, the HOLLANDIA was a safe distance from the LUFIRA and the UNION METROPOLE was a safe distance from the HOLLANDIA.

6. Visibility was described as "good" at from seven to ten miles. The wind was from the southeast.

7. After dropping her pilot at 2210, the engine room telegraph of the UNION METROPOLE was put on full ahead, the rudder was put hard to starboard, and a course of 150° T. was set. It required approximately two to three minutes to work up to full speed. The lights of an inbound vessel, later ascertained to be the AMTANK, were noticed up ahead and the course of the UNION METROPOLE was altered to 155° T. in order to safely pass this vessel port to port. As soon as the AMTANK had passed, the UNION METROPOLE returned to her course of 150° T. While the HOLLANDIA contends that the UNION METROPOLE turned hard to her starboard to avoid a collision with the AMTANK, the evidence does not supoprt this viewpoint. The AMTANK was on a course of 323° T. The two vessels passed with ample clearance, port to port, estimated at from two to three ship lengths apart by two witnesses, and at 1500 to 2000 feet by the master of the AMTANK.

8. The AMTANK, approaching Overfalls Lightship inbound from Houston, Texas, to Marcus Hook, Pennsylvania, was loaded with bulk crude oil. The master was on the bridge, the third officer at the telegraph, and an able-bodied seaman at the wheel. A lookout was posted on the flying bridge because the tanker, when loaded, took the seas over her bow. There was voice tube communication between the lookout and the wheelhouse. Regulation red and green running lights, range and mast lights, were burning.

9. The AMTANK observed, at some distance away and one to two points off her port bow, the red sidelight and open range lights of an outbound vessel which proved to be the HOLLANDIA.

10. As the AMTANK approached Overfalls Lightship and the Pilot Station,

she reduced her sea speed to maneuvering speed at 2224; to half-speed at 2226; to slow ahead at 2230, and at 2230½ her engines were stopped to await a pilot. Meanwhile, the HOLLANDIA was showing her red light indicating that the vessels were in position to pass port to port.

11. When the HOLLANDIA was slightly in excess of 1000 feet distant from the AMTANK, she sounded a one-blast signal indicating that she was altering her course to starboard. Instead of swinging to starboard, the HOLLANDIA went to port in the direction of the AMTANK. According to her master the HOLLANDIA went out of control and would not answer her rudder and, instead, continued her swing to port until she had gone through an arc of nearly 180° when she collided with the AMTANK at 2232.

12. AMTANK, confronted with the emergency created by the HOLLANDIA swinging to port rather than to starboard as indicated by the one-blast signal, contends that, as soon as the course of the HOLLANDIA was noted, AMTANK responded at 2231 by a series of short blasts known as the danger signal. HOLLANDIA denies that such a signal was given and also contends that AMTANK did not put her engines full ahead and her rudder hard right in an effort to maneuver clear at 2231½. It is urged that the record entry in the deck bell book is a self-serving "fabrication" made after the collision. While the court finds that the entries in the deck bell book recorded at 2231 (danger signal) and 2231½ (engines full ahead) were made after the collision, it is clear that a contemporaneous entry of "stop" was made at 2230½. The keeper of the deck bell book, Bague, admits that the entries made out of order were probably recorded after the impact due, in the main, to his duties at the time plus a defective flashlight which hampered his ability to place the entries in proper order. The collision, as noted, occurred at 2232 as per AMTANK's deck bell book. Even if the court disregarded the entries made after the impact, it is apparent that AMTANK was then acting *in extremis*. The engine bell book discloses a standby bell at 2230½, a full ahead at 2232, and another stop at 2232½, but there is no evidence that the clocks were synchronized and, in addition, the engine bell book entries were made to the nearest half-minute. Without condoning the recordation of entries made in the deck bell book after the collision, this action, assuming that it was deliberately done, would not alter the final conclusion that there was no last clear chance on the part of AMTANK to avoid the collision. The fault of the HOLLANDIA is established by uncontroverted proof and it is not enough to raise mere doubts about the navigation and management of the AMTANK.

13. A matter of seconds prior to the collision at a time when it appeared that the HOLLANDIA would strike aft of AMTANK's bridge, AMTANK's rudder was put hard left in an effort to throw her stern clear. HOLLANDIA continued her port swing and after covering an arc of 100° to 180°—probably nearer 180°—her starboard bow collided with AMTANK's port quarter in the vicinity of the after lifeboat platform, with both vessels then being on nearly parallel headings.

14. The HOLLANDIA was outbound for New York from Philadelphia, proceeding down the Delaware Bay astern of the UNION METROPOLE. After dropping her pilot at 2216, HOLLANDIA's engines were put at full speed ahead on course 145° T. While the master of the HOLLANDIA was somewhat uncertain as to whether the course was 135° or 145°, after being confronted with his testimony before the Coast Guard given two days following the collision he stated that 145° T. was correct. The court finds that the true course of the HOLLANDIA, after dropping her pilot, was 145°. At 2220 her engine bell book noted "full ahead for New York."

15. The master of the HOLLANDIA first sighted the AMTANK off his port bow at a time when, according to his testimony, he put his rudder starboard to pass starboard of the UNION MET-

ROPOLE, but the ship was difficult to steer because of the wind and tide and the ship was out of control. There is no credible evidence that the wind and tide was of such a character as to materially affect the navigation of any such vessel on the night in question. When HOLLANDIA's master first sighted the AMTANK, he estimated the distance between the vessels at from 1000 to 1200 feet. He concedes that his own night vision was disturbed by the lights of Overfalls and his lookout was down below drinking coffee at the time. According to the master of the HOLLANDIA, he immediately ordered a hard right rudder and sounded a one-blast signal indicating that the vessel was altering course to starboard for a port to port passing, with the results as indicated above. He testified that he later ordered full speed astern. HOLLANDIA's deck log entry attributes her out of control status to "the reduced speed and the currents."

16. When the collision occurred at 2232, the HOLLANDIA and AMTANK were about one-half mile west of Overfalls Lightship, near the line between International and Inland Waters, but still probably within Inland Waters.

17. HOLLANDIA's complaint against the UNION METROPOLE is grounded upon the contention that the latter vessel did not have a lookout astern and that when the HOLLANDIA was about to overtake the UNION METROPOLE at a point where the distance between the two vessels had closed to two or three ship lengths with the UNION METROPOLE still on the port bow of HOLLANDIA, the UNION METROPOLE suddenly and without warning turned to starboard across the bow of the HOLLANDIA. According to HOLLANDIA's master, he first sighted the UNION METROPOLE as the HOLLANDIA came to her course of 145° after dropping her pilot, and at this time the UNION METROPOLE bore about 10° on HOLLANDIA'S port bow, approximately two miles distant. The master further testified that the HOLLANDIA proceeded to catch up to the UNION METROPOLE and, when the distance between the two vessels had closed to two to three ship lengths with the UNION METROPOLE still on the port bow of the HOLLANDIA, the UNION METROPOLE suddenly turned to starboard across his bow, whereupon, in order to avoid a collision, he ordered the rudder of the HOLLANDIA full left; that at approximately the same moment he sighted the red light of the inbound vessel, AMTANK, and then ordered his rudder to starboard so as to pass the AMTANK port to port; that at this time the HOLLANDIA went out of control as heretofore described. The master intended to pass to the starboard of the UNION METROPOLE but conceded that he gave no signal of his desire to pass. Even though the HOLLANDIA had not come abreast of the other vessel, she was nevertheless the overtaking vessel in the eyes of the law, and was apparently then in Inland Waters.

18. In addition to Captain Andreadis, the master of the HOLLANDIA, the only other witness produced by Hellenic Lines, Ltd., was the seaman, Gounaris, who testified that he was the regularly assigned lookout on watch and that, when the pilot was dropped, he was sent below to cover a light that "was bothering us". He then smoked a cigarette, had a cup of coffee, and did not return to the bridge until after the collision. While libellant stresses the fact that the master had indicated that, in the absence of the lookout, an apprentice captain would take his place, it is clear from the evidence that there was no lookout on the bow of the HOLLANDIA from the time she dropped her pilot until after the collision.

19. The UNION METROPOLE had no stationed lookout but her master, third mate and helmsman were on the bridge after the pilot was dropped. Shortly after dropping her pilot, the bridge observed the outbound vessel astern of the UNION METROPOLE. While there is considerable dispute as to the distance then separating the HOLLANDIA and UNION METROPOLE, with some witnesses estimating the same at from two

to three miles and Hellenic Lines, Ltd., contending that this is an impossible approximation, it is reasonable to assume that the distance was in excess of one mile and probably as much as one and one-half miles. After observing the HOLLANDIA at a reasonably safe distance astern, no constant watch for this vessel was thereafter maintained, but the master did occasionally look astern and noted that the HOLLANDIA was never close to the UNION METROPOLE.

20. As the HOLLANDIA set her course of 145° T. and the UNION METROPOLE was steering a course of 150° T., the courses of the two vessels would ultimately converge. To this extent the UNION METROPOLE would move gradually across the bow of the HOLLANDIA. Other than as above indicated, and the 5° course change that was made by the UNION METROPOLE when she was about to pass the AMTANK, there is no credible evidence indicating that the UNION METROPOLE cut across the bow of the HOLLANDIA as testified to by her master.

21. HOLLANDIA, in answers to interrogatories, has admitted that the collision with the AMTANK occurred in Inland Waters. It follows that the attempted overtaking by the HOLLANDIA took place in Inland Waters.

■ On these facts the court reaches the following conclusions of law:

(a) HOLLANDIA's outbound 145° course was 2° starboard of reciprocal to AMTANK's inbound 323° course and, therefore, involved no risk of collision. This is confirmed by the fact that each sighted the other off the port bow and saw only the red sidelights of the other vessel.

(b) A perfectly normal port to port passing situation existed until HOLLANDIA altered course to port at the risk of imminent collision. The William J. Riddle, D.C., 102 F.Supp. 884, aff. 2 Cir., 200 F.2d 608.

(c) HOLLANDIA was at fault for altering her course to port and continuing to swing to port while allegedly out of control. She was also at fault in not maintaining a lookout who probably would have been able to sight the approaching AMTANK long prior to the time she was first observed by the master of the HOLLANDIA.

(d) When the AMTANK stopped her engines to await a pilot, one and one-half to two minutes prior to the collision, she had no reason to anticipate that HOLLANDIA would do otherwise than to continue on a safe port to port passing. The AMTANK could not possibly have anticipated that the HOLLANDIA would suddenly swing to port. The AMTANK had the right to assume, at the time, that the HOLLANDIA would be navigated properly.

(e) Notwithstanding HOLLANDIA's one-blast signal indicating that she was altering course to starboard, those in charge of the AMTANK seasonably observed from HOLLANDIA's range lights that she was swinging to port. AMTANK thereafter did all that she could do in avoiding the collision by putting her engines full speed ahead and her rudder hard right approximately 30 seconds before the impact when it then became apparent that the HOLLANDIA was out of control. AMTANK's subsequent hard left rudder, in an effort to swing her stern clear, was of little effect. AMTANK was acting *in extremis* at the times aforesaid.

(f) Those in charge of the HOLLANDIA failed to keep a proper lookout within the meaning of Article 29 of the Inland Rules, 33 U.S.C.A. § 221, as the HOLLANDIA was about to overtake the UNION METROPOLE. A proper lookout would have not only sighted the AMTANK earlier, but would have been aware of the fact that the HOLLANDIA was the overtaking vessel and under an obligation to stay clear of the UNION METROPOLE.

■ (g) An overtaking situation existed under Article 24 of the Inland Rules and the UNION METROPOLE, under the facts here stated, was under no duty to keep a lookout astern. The M.

J. Rudolph, 2 Cir., 292 F. 740; Publicover v. Alcoa, 2 Cir., 168 F.2d 672, 677. This is not a case in which the vessel is contemplating a radical change of course. Moreover, in the absence of any signal from the HOLLANDIA, what could the stern lookout have learned? S. S. Saconnett v. Tug Lu Ann, 5 Cir., 1961 A.M.C. 1406. An overtaken vessel, showing a proper stern light at night, is not ordinarily obliged to keep watch astern so long as she holds her course. Griffin on Collision (1949), § 109, p. 277. The general prudential rule does not apply to the overtaken vessel where there is no passing signal given, no reason to believe that the overtaking vessel is not under full control, and no situation arising subsequent to mutual assent indicating that an overtaking is then contemplated. The slight course change of 5° is of no consequence as applied to the circumstances of this case. The rule of Pennsylvania, 19 Wall 125, 86 U.S. 125, 22 L. Ed. 148, is not applicable to this set of facts.

(h) There was no reason for those in charge of either the AMTANK or the UNION METROPOLE to anticipate the gross faults of the HOLLANDIA that led to the collision, and any doubts as to the navigation of the AMTANK and UNION METROPOLE should be resolved in their favor, as the major faults of the HOLLANDIA are alone sufficient to account for the collision. White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir., 279 F.2d 419; Compania Nacional De Nav., etc. v. Cabins Tanker Industries, 4 Cir., 285 F.2d 592.

(i) AMTANK being free from fault, Sinclair Refining Company is entitled to recover its full damages in Admiralty No. 8072.

(j) UNION METROPOLE being free from fault, a decree will be entered dismissing the libel in Admiralty No. 7992.

Proctors for the parties will present appropriate decrees in accordance with the foregoing findings of fact and conclusions of law. Admiralty No. 8072 will be referred to a commissioner in the event the parties cannot agree upon the damages sustained by Sinclair Refining Company within sixty days from the date of said decree or, in the event of an appeal, the proceedings before the commissioner shall be held in abeyance awaiting action by the appellate court. Admiralty No. 7992 will be dismissed with costs.