**SUN OIL COMPANY**

v.

**M/V WARTENFELS, its boilers, engines, equipment, etc., in rem.**

**No. 319 of 1961.**

United States District Court
E. D. Pennsylvania.

Feb. 8, 1966.

---

Leslie C. Krusen, Eugene R. Lippman and Robert K. Wood and Krusen, Evans & Byrne, Philadelphia, Pa., for libellant.

Richard W. Palmer, Rawle & Henderson, Philadelphia, Pa., and Charles S. Haight, Jr., and Haight, Gardner, Poor & Havens, New York City, for respondent.

DAVIS, District Judge.

1. The SS. OHIO SUN is a T–2 Steam Tanker owned by Sun Oil Comany, 523' long, 68' in width, 16,722 dead weight tons, and has a horse power of 6,500.

2. The M/V WARTENFELS is a dry cargo diesel vessel, 499' 2" long, 60' in width and has a horse power of 10,800.

3. On the early morning of August 12, 1961, the OHIO SUN was proceeding seaward in the Houston Ship Channel, fully loaded. Her draft was 30' 1½" forward and 31' 7½" aft. On the bridge were a Pilot, Master and Helmsman. A Lookout was stationed on the bow. All required navigational lights were turned on. She had departed her berth at 0214 and proceeded a distance of approximately 10½ miles prior to the collision. The weather was clear.

4. On said morning the WARTENFELS was following the OHIO SUN down the Houston Ship Channel. She was only partially loaded. Her draft was 23' forward and 23'9" aft. On the bridge were a Pilot, her Master, her Third Officer and a Helmsman. A Lookout was stationed on the bow. All required navigational lights were burning. She had departed the turning basin at 0242 and proceeded a distance of ap-

proximately 15.7 miles prior to the collision.

5. The WARTENFELS was properly manned. The OHIO SUN, however, did not have a watch officer on the bridge at the time of the collision or for approximately a half-hour prior thereto. While the Master of the ship periodically glanced astern and carried out the duties of the watch officer as best he could, he was unable to keep the WARTENFELS under constant observation due to his other responsibilities.

6. The WARTENFELS was proceeding down the channel at an average speed about twice that of the OHIO SUN. When the pilot of the latter determined that the WARTENFELS was overtaking her, he sounded a local signal of three long and three short blasts, indicating that the OHIO SUN was ahead in the channel and intended to wait for the WARTENFELS. The WARTENFELS acknowledged this signal by sounding two blasts.

7. The sounding and acknowledgment of these signals did not make it mandatory for the WARTENFELS to pass the OHIO SUN, although the master of the WARTENFELS, a foreigner, believed the OHIO SUN'S signal left his vessel with no discretion on this point.

8. As the WARTENFELS approached the stern of the OHIO SUN, the former initiated a two-blast signal under the Inland Rules of the United States indicating that it proposed to pass the OHIO SUN on the latter's port side. The OHIO SUN assented to the WARTENFELS' plan by answering with two blasts. This exchange of signals took place several minutes before the collision.

9. After the exchange of blasts, the WARTENFELS increased its speed at 0426 to half ahead (12 to 13 knots) and at 0427 to full ahead (15 knots). During this time, the pilot also ordered the vessel 10 degrees port rudder, then 20 degrees port rudder, and finally hard port rudder.

10. Until the exchange of blasts, both vessels were approximately in the center of the channel. The OHIO SUN then eased to the starboard side of the channel to give the WARTENFELS room to pass. In the five minutes prior to the collision, the OHIO SUN was travelling at a speed of approximately 5½ knots.

11. Just before the collision, the WARTENFELS had come to within approximately 60 to 70 feet of the left bank and had had engines set at full speed ahead for at least two minutes.

12. Due to the WARTENFELS excessive speed and its proximity to the left shore, the forces of bank suction caused it to sheer to the starboard side of the channel at the bend adjacent to the battleship Texas monument.

13. Bank suction is a combination of forces which causes a ship's bow to move out from an adjacent bank, toward the far shore. It usually occurs when a large ship is in a narrow waterway such as the Houston Ship Channel and can often be corrected by turning the rudder toward the bank from which the vessel is moving. However, an overcorrection can force the ship toward the near bank while an undercorrection or insufficient correction may cause the ship to head rapidly toward the opposite shore. Some of the factors which are relevant and vary directly to the amount of bank suction besides the size of the ship and the narrowness of the channel are the vessel's speed, its draft and its proximity to one bank and its distance from the other.

14. The OHIO SUN turned slightly to the left as it followed the direction of the Houston Ship Channel. During the three minute period prior to the collision, her heading changed 25.2 degrees to port.

15. The WARTENFELS' observation of the various lights on the port side of the OHIO SUN was due not to any sheering to the left by the OHIO SUN but due to the fact that the WARTENFELS was overtaking her.

16. At approximate 0429, the pilot of the WARTENFELS ordered emergency full astern, sounded the danger signal, and then three short blasts to signify

that the vessel was going to full astern. The effect of the WARTENFELS' engines going full astern was to throw her bow even further to starboard causing her to collide with the OHIO SUN.

17. Immediately after the danger signal, the captain of the OHIO SUN ordered full ahead and a hard left rudder to which the vessel was responding at the time of the accident.

18. At approximately 0430 on August 12, 1961, the bow of the WARTENFELS struck the port quarter of the OHIO SUN, approximately 25 feet forward of the latter's stern. The collision occurred on the right descending side of the channel. The Houston Ship Channel is only 350 feet wide and 35 feet deep at the point of impact.

## DISCUSSION AND CONCLUSIONS OF LAW

### I.

Before discussing the issue of fault, the Court is faced with introductory questions pertaining to the burden of proof and the existence of presumptions.

■■ The Libellant argues that the Respondent has the burden of proof in the sense of the risk of non-persuasion since the latter was the overtaking or "burdened" ship. While the cases are somewhat vague and ambiguous due often to an imprecise use of the term "burden of proof", the better rule only places on the overtaking ship the burden of going forward with the evidence once it is shown that she was the overtaking vessel and that she collided with the overtaken ship. See Clara, 102 U.S. 200, 26 L.Ed. 145 (1880); Gosnell v. United States, 262 F.2d 559 (4th Cir. 1959); B.F. Diamond v. M/V Fernside, 252 F.2d 381 (5th Cir. 1958); The Percheron v. Alabama Transit Co., 246 F.2d 135 (5th Cir. 1957); The Greystoke Castle, 199 F. 521 (N.D.Calif.1912); Sif, 181 F. 412 (E.D.Pa.1910); Charles R. Spencer, 178 F. 862 (D.Oreg.1910); Mesaba, 111 F. 215 (S.D.N.Y.1901); Griffin, Collision §§ 24, 61. The proof required of the respondent to rebut the presumption in favor of the libellant is some evidence that the collision was not her fault or was the fault of the libellant or was the result of an inevitable accident. Patterson Terminals Inc. v. S.S. Johannes Trans., 209 F.Supp. 705 (E.D.Pa.1962); Patterson Oil Terminals v. The Port Covington, 109 F.Supp. 953 (E.D.Pa. 1952), aff'd 205 F.2d 694 (3d Cir. 1953). After such evidence is presented, the presumption in favor of the overtaken vessel disappears and the libellant's duty to prove her case by a preponderance of the evidence remains without the aid of the presumption. See Wigmore, Evidence §§ 2485-2493.

■ In addition, if the court finds that either vessel has violated a statutory duty, that vessel has the burden of going forward with evidence to show not only that her fault probably did not cause the collision but that it *could* not have caused or contributed to it. The Pennsylvania, 19 Wall. 125, 136, 86 U.S. 125, 136, 22 L. Ed. 148 (1873); Boyer v. The Merry Queen, 202 F.2d 575 (3d Cir. 1953); Gilmore & Black, Law of Admiralty, § 7-5; Griffin, Collision §§ 24, 200.

### II.

■ While the WARTENFELS produced evidence tending to negate any fault on her part so as to remove the presumption in favor of the OHIO SUN, the court finds that the libellant proved by a preponderance of the evidence that the respondent was guilty of negligence and that this contributed to and was a cause of the collision. Instead of reducing her speed as the overtaking vessel to make the speed differential between herself and the OHIO SUN as small as possible, as should be done in a passing situation in the narrow Houston Ship Channel,[1] the WARTENFELS ordered

1. Libellant's witness Captain Plummer testified at p. 408:
   Q. Captain, based on your experience as a pilot in narrow channels, which you have described as 350 feet wide, and in channels which have a depth of 35 to 36 feet, have you an opinion as to what is a reasonable and proper speed with which

her engines to full ahead. This increased momentum and her proximity to the port shore brought the forces of bank suction into play, making her sheer to starboard and collide with the OHIO SUN.

The respondent was also in violation of her statutory duty under the Inland Rules of Navigation, Art. 24, 33 U.S.C. § 209 which provides:

> "Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel."

Although this clause must not be read literally so as to hold an overtaking vessel liable in every situation where she does not in fact "keep out of the way", there are no extenuating circumstances here to extricate the respondent from the force of the rule. The Pilar De Larrinagea, 42 F.Supp. 648 (E.D.Pa.1942); See, The Artemis, 39 F.2d 553 (2d Cir. 1930).

The WARTENFELS clearly did not meet her burden of going forward to show that this infraction could not have been a cause of the accident even if she did violate the statute. The collision with the OHIO SUN was a direct result of her failure to observe Art. 24 of the Inland Rules of Navigation, 33 U.S.C. § 209.

### III.

The respondent contends that even assuming her own negligence, the libellant did not have a proper lookout astern and therefore must also be held at fault. Specifically, the WARTENFELS alleges that the OHIO SUN violated the Inland Rules of Navigation, Art. 29, 33 U.S.C. § 221 which provides:

> "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, of any neglect to keep a *proper lookout,* or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." (Emphasis added).

The OHIO SUN had no special watch officer on duty after 0400 on the morning of the collision, and no one on that vessel observed the WARTENFELS during the crucial time between the latter's signal to pass and its sounding of the danger signal seconds before the collision. While the captain of the OHIO SUN glanced astern periodically, he certainly was not a lookout "with no other duties". See Chamberlain v. Ward, 21 How. 548, 62 U.S. 548, 16 L.Ed. 211 (1859); Circle Line Sightseeing Yachts v. City of New York, 283 F.2d 811 (2d Cir. 1960).

■■ The statute itself does not define a proper lookout, but the cases and authorities hold that there is no general duty upon an overtaken vessel to keep a watch astern under all circumstances so long as she has a proper stern light as the OHIO SUN did. Ellis Towing & Transportation Co. v. Socony Mobil Co., 292 F.2d 91 (5th Cir. 1961); Hellenic Lines, Ltd. v. S.S. Union Metropole, 206 F.Supp. 383 (E.D.Va.1962); In re Landi's Petition, 194 F.Supp. 353 (S.D. N.Y.1960); Griffin, Collision § 108. There is language in some of the cases that if the overtaken ship changes her course or speed or moves astern, she must provide a lookout, but none of these situations exists here. See, e. g., Nassau Barge Corp. v. The Fred B. Dalzell, 180 F.2d 560 (2d Cir. 1950); Corsair, 37 F.2d 45 (2d Cir. 1930); Boston Sand & Gravel Co. v. United States, 7 F.2d 278 (1st Cir. 1925). In general, an overtaken

to pass another vessel in an overtaking situation?
A. Yes, sir, I have an opinion.
Q. Will you please tell the Court what it is, sir?
A. The slower the overtaking vessel comes, the less bad effect she will have on the vessel she is overtaking, and also the less danger there is in her taking a sheer.

Respondent's witness Captain Bratcher testified at p. 493:
Q. Captain, would you disagree with the statement:
In narrow channels the actual passing should be done with as small a difference in relative speeds as practicable.
A. No, I would not disagree with that.

vessel has the right to assume that the overtaking vessel will keep clear absent any sudden and unexpected move on the part of the overtaken vessel. See In re Landi's Petition, supra.

The respondent relies on Stevens v. United States Lines Co., 187 F.2d 670 (1st Cir. 1951) for the proposition that a lookout astern is required. There a freighter collided into a cabin cruiser travelling in the same direction. The District Court held them each at fault and the Court of Appeals affirmed. The Trial Court found the overtaken vessel negligent due to the captain's failure to glance astern even occasionally when he knew that a much larger ocean going vessel was proceeding up the channel behind him. The case at bar is plainly distinguishable, first of all, because the captain of the OHIO SUN did glance behind periodically and secondly because the two ships here were relatively the same size, so that the danger in a passing situation would not be so great to the OHIO SUN as it was to the overtaken vessel in the case cited by the respondent. Moreover the Court in *Stevens* recognized explicitly that the overtaken vessel is under no duty to maintain a constant watch astern.

The other decisions cited by the respondent are not on point. They deal with the duties of a lookout once it is determined that one is required but are not helpful here where the question is whether a watch astern was demanded in the first place.

The respondent also contends that the libellant was at fault in violating the Inland Rules of Navigation, Art. 18, 33 U.S.C. § 203 which reads:

"The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

While the OHIO SUN did bear slightly to port during the few minutes prior to the accident as it followed the path of the channel which itself bent slightly to port, the court has made a finding of fact that the libellant in no way crossed the bow or crowded the respondent but to the contrary that the respondent sheered across the channel into the libellant. The various lights of the OHIO SUN'S port side, which the WARTENFELS observed, indicated not that the OHIO SUN was sheering to the left but that the WARTENFELS was overtaking her.

### ORDER

And now, this 8th day of February 1966, it is hereby Ordered and Decreed that judgment be entered for the libellant and against the respondent for the damages sustained by the libellant as a result of the collision on August 12, 1961 in the Houston Ship Channel. The libellant shall submit within ten days an appropriate decree for the appointment of a commissioner to determine the amount of the damages.