F. Hugh COLE, G. M. Mills and Stonewall Insurance Company, Plaintiffs,

.v.

SABINE TOWING AND TRANSPORTATION COMPANY, INC., a corporation, in personam, and the TUG BOAZ, in rem, Defendants.

Civ. A. No. 76-269-T.

United States District Court, S. D. Alabama, S. D.

May 31, 1977.

A. Clay Rankin, III, J. Hodge Alves, III, Mobile, Ala., for plaintiffs.

Geoffrey V. Parker, Mobile, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on the 10th day of May 1977. The

Court, after examining the pleadings and the evidence presented at the trial makes the following Findings of Fact and Conclusions of Law involved in the collision of the S/T KEY LARGO, owned by F. Hugh Cole, and the Tug BOAZ, owned by Sabine Towing and Transportation Company, Inc.

## FINDINGS OF FACT

1. This action involves a collision between the S/T KEY LARGO and the Tug BOAZ and her tow, which occurred in the Intracoastal Waterway at Wolf Bay, Alabama. The collision took place on June 1, 1975, at approximately 5:30 in the afternoon. The light and visibility that afternoon were good, and the water was calm, with no appreciable current.

2. The BOAZ is, and was at all material times, owned and operated by the defendant, Sabine Towing and Transportation Company, Inc. The BOAZ is 69.9 feet long, 24 feet wide and has a draft of 8.5 feet. She is propelled by two 379 cubic inch Caterpillar engines, which together provide 1,100 horsepower. She is equipped with two 69 inch diameter, 38 inch pitch propellers. Her tow on June 1st consisted of three loaded gasoline barges, Barges Nos. 31, 32 and 33. The barges were made up to the BOAZ in numerical order, with the stern of Barge No. 31 made up directly to the bow of the tug. Barges Nos. 31 and 33 were each 232 feet long and 50 feet wide. Barge No. 32 was 132 feet long and 50 feet wide. All three had drafts of 8.5 feet. The total length of the flotilla, including the Tug BOAZ, was 665.9 feet. Captain Luther Ellis was in command and at the controls at the time of the collision.

3. The other vessel involved in the collision, the KEY LARGO, is a fiberglass-hulled shrimp trawler. The KEY LARGO is 68.2 feet long and 19.5 feet wide. Her draft is 8.5 feet. She is, and was at all material times, owned by one of the plaintiffs, F. Hugh Cole, and was captained on June 1st by another plaintiff, G. M. Mills. Plaintiff Stonewall Insurance Company is the subrogee of F. Hugh Cole to the extent of amounts paid to Cole under a policy of hull insurance covering the KEY LARGO.

4. On June 1, 1975, the shrimp trawlers TROJAN, PANDALUS and KEY LARGO, in that order, left Gulf Shores, Alabama, at approximately 3:30 in the afternoon. They were heading east in the Intracoastal Waterway, bound for Pensacola Pass, Florida. They maintained a distance of from one-half to one mile between each vessel.

5. A little after 5:00, the lead trawler, the TROJAN, began to overtake the BOAZ, which was also eastbound in the Waterway. The captain of the TROJAN, Charles King, contacted Captain Ellis of the BOAZ at Mile 159, a short distance before the Intracoastal Waterway enters Wolf Bay. Captain King requested permission via VHF radio for the three trawlers to pass the tug on the port side. Captain Ellis granted the request, and advised King that when the tug reached the straightaway in Wolf Bay, he would slow down to facilitate the passing, and that the trawlers should make the passing at that time. Captain King agreed, and relayed the information to the KEY LARGO and the PANDALUS via Channel 10 on its CB radio, since they had no VHF radio.

6. The Intracoastal Waterway at Mile 160 between Buoys 127 and 125, where the passing and the collision took place, is 125 feet wide and 12 feet deep. The channel has side slopes of one foot vertical to five feet horizontal. (Plaintiffs' Exhibits Nos. 1, 2 and 3) This point is just beyond the exit from Portage Creek and is a short distance into the straightaway across Wolf Bay.

7. When the BOAZ reached Mile 160, Captain Ellis slowed down to 1.5 miles per hour (500 engine r. p. m., 154 propeller r. p. m.) to allow the trawlers to pass. Both the TROJAN and the PANDALUS completed the port side passage without difficulty or incident. The KEY LARGO was still between one-half and one mile behind the PANDALUS. When the KEY LARGO was about one-half mile from the BOAZ, Captain Ellis sighted her and was aware of her approach and relative position throughout the abortive passing attempt.

8. Captain Mills steered the KEY LARGO to the north side of the channel, about 10 feet from the red buoy line and was proceeding at about 6 miles per hour. As the KEY LARGO began to pass, the BOAZ was very close to the south side of the channel, maintaining her speed of 1.5 miles per hour. Although estimates at trial varied widely, given the size of the vessels and the channel itself, the Court finds that the passing took place at a distance of approximately 40 feet.

9. When the KEY LARGO had reached a point between one-half and one-third past the stern of the first barge, Barge No. 31, Captain Ellis put both throttles of the BOAZ ahead to keep the head of his tow from drifting out of the channel. The amount of the increase was contested. Plaintiffs claimed that the increase, to have any effect, would have had to have been to full ahead. Captain Ellis, who put the throttles ahead himself, stated that it was only one-quarter. Since there is no valid reason to disbelieve the Captain, and since his is the only primary source of information available, the Court finds that the increase in power was one-quarter throttle. This increased the engine speed, or r. p. m., from 500 to 800, and the propeller speed from 154 to 247 r. p. m., but produced no increase in the vessel's actual speed, or speed through the water. At about the same time, the KEY LARGO suddenly began to veer to the South. Captain Mills tried to stop the veer by steering to port, and then by increasing his speed to full ahead to get more rudder power. These maneuvers were unsuccessful, and the starboard bow of the KEY LARGO struck the port side of Barge No. 31 at about midpoint. The angle of impact was approximately 80° towards the bow of the barge. The KEY LARGO slid back along the barge, brushed the BOAZ, and drifted clear.

10. The primary issue is, of course, the reason for the veer of the shrimp trawler into the barge. The defendant contends that it could have been any one or combination of causes, including striking a submerged object, excessive speed and poor handling on the part of the trawler's captain, or the fact that the KEY LARGO was "down by the head" and thus unstable. The plaintiffs contend that the veer was caused by a hydrodynamic force acting on the KEY LARGO and created by the increase in propeller speed when Captain Ellis put the BOAZ' throttle ahead while the KEY LARGO was passing. In essence this theory, as presented by Marine Engineer R. H. Roemer, advances the proposition that an increase in propeller speed to almost full ahead would cause a laminar flow of a mass of water to the propellers, sufficient to set up a velocity field which could in turn immediately deflect the course of the KEY LARGO toward the flotilla. However, the theory assumes as a basis for its calculations an increase in propeller speed to 360 r. p. m. (Plaintiffs' Ex. No. 10) This would reflect a change in engine r. p. m. to almost full ahead (full ahead being 1225 r. p. m., and engine r. p. m. sufficient to produce 360 r. p. m. at the propeller being approximately 1160). It was, of course, plaintiffs' contention that Captain Ellis had put the throttles full ahead, but as was noted above, the preponderance of the evidence is that the change was in fact from 500 r. p. m. to 800 r. p. m. This would translate, at an engine-to-propeller reduction of 3.24, into a change at the propeller of from 154 r. p. m. to 247 r. p. m., or less than 100 r. p. m. While Mr. Roemer contended that the starting point for estimating the force was unimportant, he freely admitted that a change in propeller speed of the degree found by the Court to have taken place would have had a negligible effect on the KEY LARGO, putting it at least on the "ragged edge" of his calculations. The Court must therefore find that the theoretical hydrodynamic force, even if it did occur, would have been insufficient to account for the veer of the trawler, and thus that the exact cause of the collision remains unclear.

11. Captain Ellis' decision to increase power to offset a loss of headway and southward drift was a proper response to the situation. He had no reason to fear that such a slight increase would affect the navigation of the KEY LARGO, in fact, the

Court has found that it did not affect the KEY LARGO. The fact that it was only a slight increase speaks for the view that Ellis was aware of, and was taking the action of increasing his power with concern for the presence and safety of the KEY LARGO. The slight increase in power in order to keep his flotilla of loaded gasoline barges on course and inside the channel was, in the opinion of the Court, not only prudent and reasonable seamanship, but also necessary under the circumstances to prevent what could very well have been an even more serious accident.

12. The Court finds that the preponderance of the evidence is that the veer of the KEY LARGO was not caused by the BOAZ' propellers, and that Captain Ellis was not negligent in increasing his engine power slightly while the KEY LARGO was passing.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this cause by virtue of its admiralty and maritime jurisdiction. 28 U.S.C. § 1333.

2. Since the collision took place in the Intracoastal Waterway, the Navigation Rules for Harbors, Rivers and Inland Waterways govern. 33 U.S.C. §§ 151, et seq. Under the facts of this collision, as set out above, the KEY LARGO was the overtaking vessel, and the Tug BOAZ was the overtaken vessel. Further, the KEY LARGO veered or sheered into the BOAZ. Generally, when an overtaking vessel strikes the vessel it is passing, the overtaking vessel is presumed to be at fault, and must prove that it was free of fault in the collision. *Liner v. Crewboat Mr. Lucky,* 275 F.Supp. 230 (E.D.La.1967). The same presumption arises when one vessel veers or sheers into the path of another. Griffin, The American Law of Collision, 1949, §§ 25, 288. This presumption may be rebutted by showing that the striking or sheer was caused by the other vessel. *Sun Oil Company v. M/V Wartenfels,* 250 F.Supp. 244 (E.D.Pa.1966); *Intercontinental Bulktank Corp. v. M/S Shinto Maru,* 422 F.Supp. 982 (D.Or.1976). However, since in this case

the overtaking and sheering vessel is also the plaintiffs' vessel, these presumptions do not significantly alter or increase the normal plaintiff's burden of proving that the collision was the fault of the defendant.

3. Under the circumstances, the Tug BOAZ had a duty to maintain its course and speed. 33 U.S.C. § 206; Inland Rules of the Road, Art. 21. The KEY LARGO, as the overtaking vessel, had a duty to keep out of the way of the BOAZ as she completed her overtaking maneuver. 33 U.S.C. §§ 207–209; Inland Rules of the Road, Arts. 22–24. The basic contentions of the plaintiffs are first, that the defendant was guilty of negligence in increasing the speed of his engine, which negligence caused the collision, and second, that the increase in engine speed by the BOAZ was a violation of its duty to maintain course and speed under Article 21, and that therefore the defendant must prove that the violation could not have caused or have been a cause of the collision.

4. Plaintiffs' contention that the actions of Captain Ellis of the BOAZ were in violation of Article 21 of the Inland Rules and that therefore the Pennsylvania Rule should be applied to this case will be considered first. As is well-known, the Pennsylvania Rule places on the party who has violated a statutory command the heavy burden of proving that the violation could not have caused the collision. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). Plaintiffs contend that the change in engine and propeller speed, or r. p. m., although unaccompanied by any change in the actual speed of the vessel through the water, constituted a change in "course and speed" under Article 21. In essence, the requirement that the overtaken vessel keep her course and speed is a command that its actions be, to the greatest extent possible under the circumstances, predictable by the overtaking vessel, so that it in turn may fulfill its duty of keeping out of the way of the privileged or overtaken vessel imposed by Article 24. 33 U.S.C. § 209; *Commonwealth & Dominion Line v. United States,* 20 F.2d 729 (2d Cir. 1927);

*Nicolas Eustathiou & Co. v. United States,* 178 F.Supp. 33 (D.Va.1959). The requirement that course and speed be maintained does not, however, require that the overtaken vessel "freeze" in the exact course and speed in which it is found by the overtaking vessel. *Skibs Aktieselskapet Orenor v. The Audrey,* 181 F.Supp. 697 (E.D.Va. 1960). The overtaken vessel does not violate Article 21 if she makes merely such incidental changes as are fairly to be expected in the normal course of navigation. Such changes may include, for example, following the path of a river or channel, a change of course or speed to avoid a danger or slackening speed to facilitate passing. Further, the normal increase of a vessel's speed as her engines attain their full power is not a change of speed which violates the rule. Griffin, *supra,* § 63. The Court is of the opinion that the slight change in engine speed which took place in the instant case in an attempt to keep the flotilla in the channel was necessary, and falls within the category of those slight or incidental changes which are or should be expected in the normal course of navigation, and therefore was not a violation of Article 21. Since there was no statutory violation, the "drastic and unusual" presumption known as the Pennsylvania Rule should not be applied in the present case.

5. The overtaking vessel, absent fault on the part of the overtaken vessel, bears all risks inherent in or incident to the passing. Griffin, *supra,* § 61. Since in the present case the plaintiffs may not avail themselves of the Pennsylvania Rule presumption and thus force the defendant to show that its actions could not have caused the collision, the plaintiffs must show negligence or fault on the part of the defendant which caused the collision. This the plaintiffs have not been able to do, since their only allegation of fault concerned the fact that the BOAZ increased power while the KEY LARGO was passing, and thus caused the collision, and the Court has concluded that this was not the case. The plaintiffs have failed to carry their burden, and may not recover.

Judgment in accordance with the above Findings and Conclusions will be entered.