**KIM CREST, S.A., Plaintiff,**

**v.**

**M.V. SVERDLOVSK, in rem, and the Baltic Shipping Company, in personam, Defendants.**

**No. Civ. A. H–87–3377.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 18, 1990.

William C. Bullard, Houston, Tex., for plaintiff.

Mark Cohen, Houston, Tex., for defendants.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

HUGHES, District Judge.

1. *Introduction.*

On October 28, 1987, the M.V. *Sverdlovsk*, traveling inbound in the Houston Ship Channel, rammed the starboard quarter of the M.V. *Cisco*, damaging both vessels. Baltic Shipping Company escapes direct *in personam* liability because the compulsory pilot was solely at fault. Baltic Shipping Company, as an agent of the Union of Soviet Socialist Republics, is indirectly liable *in personam*, however, for the damages caused by the *Sverdlovsk* to the extent the ship would have been liable *in rem*.

2. *Vessels.*

The *Cisco*, owned and operated by Kim Crest, S.A., is an ocean-going general cargo vessel of 105.57 meters, 3,768 tons, and Panamanian registration. The *Cisco* drew 15 feet. The *Sverdlovsk*, owned and operated by the Baltic Shipping Company, an agent of the government of the Union of Soviet Socialist Republics, is an ocean-going general cargo vessel of 173.51 meters, 15,893 tons, and Soviet registration. The *Sverdlovsk* drew 27 feet. The ship engaged in commercial activities for the owner.

From entering the outer channel at Galveston until the collision, the *Cisco* was under the command of Houston pilot Larry Burnthorne, and the *Sverdlovsk* was under Houston pilot Robert White, Jr. The lights, lookout, navigation instruments, communication equipment, steering gear, propulsion machinery, manning, training, and supervision were in good order and were seaworthy on both ships. No malfunction of machinery or unavailability of machinery contributed to the collision.

In addition to the *Sverdlovsk* and the *Cisco*, the activity of three other vessels caused part of the confusion resulting in the collision. The *Princess Highway*, a car carrier of Japanese registration, began its inbound trip at approximately the same time as the *Sverdlovsk*. The *Princess Highway* was under Houston pilot James Griffin. The *Marine Ruby*, an outbound tug and towboat, was about one mile to the north of the collision, up the Houston channel. Another towboat, the *Lilly Trahan*, crossed from east to west in the intercoastal waterway before the collision, also to the north.

3. *Location.*

The entrance to the Port of Houston begins at the gap between Galveston Island and Bolivar Point. Between the jetties, the channel runs roughly east to west about four and one-half miles until the Galveston Channel branches to the south. These segments are the outer and inner bar channels. Near buoy 16 the Houston channel turns to the northwest towards Texas City for about one mile, where, at buoy 18, the channel turns slightly more northerly to buoy 25A. This segment is the Bolivar Roads. The intercoastal waterway crosses Bolivar Roads at its northern end and near the beginning of the Houston Ship Channel at buoy 25A and about one mile to the northwest of buoy 18 at the turn in the middle of Bolivar Roads. The channel is much narrower above the start of the Houston Ship Channel proper, where it runs up Galveston Bay to Morgans Point. The water outside of the channel, north of this narrowing point, is too shallow for ships to navigate.

4. *Communications.*

Ships in the Houston channel communicate with each other by the traditional whistle signals. Pilots and crew can also communicate with each other by the ships' radios and the pilots' radios. Ships passively communicate their positions by the combination of running and range lights they are required to carry. Through Houston Vessel Traffic Service (Traffic Service), the Coast Guard monitors the movement of vessels between buoy 11 in the Galveston Inner Bar Channel and the Manchester docks at the Interstate 610 bridge, near the inland terminus of the channel. Traffic Service gathers information by radar and radio surveillance and broadcasts it on a marine radio channel. Traffic Service monitors and records transmissions on two radio channels. The radio communication between the pilots of the *Sverdlovsk* and the *Cisco* was recorded by Traffic Service. The transcriptions are in evidence.

The casual, vague exchange of messages over the radio among the pilots was appalling. One of the qualities required of harbor pilots is clarity of signals, including radio communications. Fortunately, in this case, the sloppy communication procedures did not cause the collision.

5. *Narrative.*

On Sunday, October 25, 1987, the *Cisco* left Mobile for Houston in ballast to load bulk wheat for shipment to Venezuela. About 1:39 a.m., on October 28, the ship

picked up Pilot Burnthorne at the sea buoy that marks the entrance channel to the Houston Ship Channel. On the bridge were Captain Eric Anneveldt, Third Mate Marcelino Sepra, and Helmsman Bimbo Demate in addition to Burnthorne. The weather and visibility were good, and the seas were slight, with a five knot wind from the northeast and a flood tide producing a one knot current up the channel.

The two other inbound vessels were seaward of the *Cisco*. Both the *Princess Highway*, piloted by Griffin, and the *Sverdlovsk*, piloted by White, were larger, faster, deeper draft, and headed farther up the channel than the *Cisco*. Pilots Griffin and White talked aboard the pilot boat that took them to the *Princess Highway* and *Sverdlovsk*. Griffin told White that he would slow the *Princess Highway* to allow the *Sverdlovsk* to overtake it because the *Sverdlovsk* was traveling farther up the channel than the *Princess Highway*. Later, Griffin, White, and Burnthorne agreed by radio that the two larger vessels were to overtake the *Cisco* before it entered the narrow part of the Houston Ship Channel at the Texas City branch, buoy 25A. Burnthorne also agreed by radio to slow and to steam out of the channel to the north of the red, starboard buoys. That would allow the *Sverdlovsk* and the *Princess Highway* ample room to pass safely to the *Cisco*'s port.

With White on the bridge of the *Sverdlovsk* were Captain Vladimir Shvedov, Second Officer Valery Slesarev, Helmsman Viktor Kalinin, and Lookout Radik Fatakhov. The *Sverdlovsk* overtook the *Princess Highway* to its port, near buoys 3 and 4, seaward of the jetties. White ordered full maneuvering speed, about 14 knots plus the current, for the *Sverdlovsk*.

The captain of the *Marine Ruby* discussed the inbound vessels over the radio with the pilots. He agreed to wait near buoy 25A until the three ships had passed to the north so that he could safely pass across the channel to the east into the intercoastal waterway. Shortly before the *Sverdlovsk* rounded buoy 16, the *Cisco* saw the *Lilly Trahan* make its passage. Pilot

White on the *Sverdlovsk* never indicated that he saw the *Lilly Trahan,* but its lights and those of the *Marine Ruby* could have contributed to White's initial confusion. About 2:33, pilot Griffin on the *Princess Highway* reported to Burnthorne by radio that he was approaching buoys 7 and 8. Griffin requested the *Cisco's* position. Burnthorne responded, "I'm up here by 16, keep her coming." Six minutes later, White on the *Sverdlovsk* reported to the *Lilly Trahan* that he was "headed up on 11 and 12" and that there was a ship ahead of him. He then told the *Lilly Trahan,* "I think they're going to let me around him. I don't know. You talk to him though."

Approximately one mile from buoy 16 to the west northwest, White turned the *Sverdlovsk* to starboard toward buoy 18. As the *Sverdlovsk* rounded buoy 16, White became confused by the appearance of a white light off the *Sverdlovsk*'s port bow. White apparently thought this was the stern light of a new, small vessel, not the stern light of the *Cisco*. White ordered Slesarev to sound two short blasts of the whistle, signifying White's intention to pass this vessel by leaving it to the *Sverdlovsk*'s starboard. Not hearing a reply, White ordered the two blast signal repeated.

Having heard no reply from the stern light vessel, White made a third two-blast whistle. The *Sverdlovsk*'s whistle signals prompted this radio call from Burnthorne on the *Cisco:*

Burnthorne (*Cisco*): Yeah, you blowing for me?

White (*Sverdlovsk*): I'm blowing for that thing right in front of me there.

Burnthorne: Yeah, that must be me, my tail-light. I'm behind 18 now, come on by me on two.

White: Yeah, okay, okay. Just north of 18.

Burnthorne: That's right. I'm outside the reds, captain, come on.

White: Something else right there under my bow.

Ignoring the response from the *Cisco* and ignoring the absence of a response from another ship, White evidently

changed his mind about overtaking the vessel by leaving it to the *Sverdlovsk's* starboard because he ordered Slesarev to sound one short blast of the whistle, to signal his intention to pass the vessel leaving it to the *Sverdlovsk's* port. He then ordered right rudder. The one blast signal was not answered. The single blast may have been repeated, but it was never answered. These movements of the *Cisco* and *Sverdlovsk* were monitored by Traffic Service, but no warnings were broadcast. White did not inquire of Traffic Service whether it had another vessel in White's path astern of the *Cisco*. White began to overtake a ship without an agreement. As the *Sverdlovsk* swung to port, the bow struck the *Cisco*'s starboard stern quarter at almost ninety degrees. Following the collision, the *Sverdlovsk* passed the *Cisco* starboard to starboard, reentered the channel, and steamed north toward Houston. The pilot and the master of the *Sverdlovsk* radioed the *Cisco* to ask whether assistance was required. None was requested. The *Cisco* anchored near buoy 16.

### 6. The "Sverdlovsk".

White's confusion about the *Cisco*'s location was not apparent to Captain Shvedov or Second Officer Slesarev until the collision was imminent. To Shvedov and Slesarev, who were on the bridge with White, the transit through Bolivar Roads appeared normal. As the *Sverdlovsk* approached buoy 16, Captain Shvedov clearly observed the *Cisco* off the *Sverdlovsk's* starboard bow. After the *Sverdlovsk* rounded buoy 16, a turn to starboard, the *Cisco* was ahead, directly off the *Sverdlovsk's* port bow. Second Officer Slesarev fixed correctly the *Cisco's* position at this time, about 2:53, as south of buoy 18, slightly to the right of the channel, about one-half mile ahead of the *Sverdlovsk*.

As the *Sverdlovsk* progressed from buoy 16 toward 18, White's rudder orders had gradually taken the vessel out of the channel to the right. Captain Shvedov knew the *Cisco* was to be overtaken, but he did not know White's plan. He also did not know that White had not identified the *Cisco*. Shvedov thought that the *Cisco*

could be overtaken on either side. In the curtained area of the bridge where the vessel's charts are kept, Shvedov ascertained the depth of water to the right of the channel. Shvedov did this to confirm that White's course had sufficient water to the right since he had wandered to the starboard boundary of the channel and since he might decide to cut the corner leaving the channel itself.

Satisfied that there was sufficient depth to the starboard, Captain Shvedov emerged from the chartroom and saw several white lights and the shape of a ship immediately ahead of the *Sverdlovsk*. He ordered the rudder hard to port and the engine to stop. He tried to avert the collision by directing the *Sverdlovsk* to the port, behind the *Cisco's* stern. When Shvedov issued his orders, the vessels were *in extremis*. The hard port rudder was a reasonable order given the vessels' positions, and it was seconded by the pilot. If the rudder hard to starboard had been maintained, the *Sverdlovsk* would have likely hit the *Cisco* amidships, with a greater casualty.

As is customary, radio communication with other vessels was made by White in English, using his pilot's hand-held radio. White requested no assistance. In these circumstances, Shvedov and Slesarev could not know that White had no agreement from the *Cisco* or that he was disoriented. Intervention earlier by Shvedov would have been imprudent.

■ The *Sverdlovsk* was seaworthy, and its master, officers, and crew were not negligent. Shvedov cannot be faulted for not intervening and relieving White sooner than he did. Because pilots are the experts in maneuvering vessels in the channel and they are a primary repository of local knowledge and techniques for safe shiphandling inside the roadstead, Shvedov was entitled to assume that White was an expert on local conditions and practices, until it became manifest that the pilot was steering the *Sverdlovsk* into danger. Shvedov and his officers and crewmembers did not abandon their vessel to the pilot. In-

stead, they carefully monitored the *Sverdlovsk*'s progress and the actions of White.

### 7. *White.*

■ White was negligent in continuing at a rapid speed through the Bolivar Roads when he was confused about what vessels were in his danger zone. His speed and course orders were insufficiently informed to rise to the level of performance required of a reasonably prudent, seamanlike passage up the channel. He was negligent in rounding buoy 16 and apparently lost his position. He was negligent in not slowing the *Sverdlovsk* when he realized that he was confronted with an unexpected vessel. He was negligent for attempting a last minute one-whistle overtaking without an agreement from the vessel ahead of him. He was negligent in turning the *Sverdlovsk* hard to the starboard at the last minute. After the fact, White testified that the starboard turn would have brought the *Sverdlovsk* inside the turn to the starboard of the *Cisco*, but the court believes White was not candid. If White really believed this, his seamanship was defective.

The United States Coast Guard investigated the collision and determined that White's error in judgment caused it. "The pilot ... failed to keep clear of the stand on vessel (*Cisco*) in an overtaking situation." The court concurs.

### 8. *The "Cisco".*

■ The *Cisco* was not negligent. As the vessel being overtaken, the *Cisco* was obliged to maintain its course and speed. The *Cisco* only altered its course to the starboard when the *Sverdlovsk* was close enough to place the vessel *in extremis*. More importantly, even if *extremis* had not been reached, the *Cisco* had an agreement for the *Sverdlovsk* to pass to the south, its port. If the burdened vessel had followed the passing agreement, the *Cisco*'s starboard turn would not have mattered. At best for White, he approached the unknown ship at a high speed and attempted to overtake it without any acknowledgement that the ship knew he was closing dead astern.

The rules of navigation do not require the *Cisco* to await impact. As the vessel ahead, the *Cisco* had the right of way.

The navigation rules dictate that the *Cisco* should have had a separate lookout on duty at the time; however, the absence of an additional lookout played no part in White's confusion of lights, drift out of the channel, or attempt to pass. The crew of the *Cisco* had properly monitored the pilot, knew their position, and observed the *Sverdlovsk*, *Lilly Trahan*, and *Marine Ruby* as they each affected the navigation of the *Cisco*. If the absence of a lookout is negligence as a matter of law, it is not the premise for liability of the *Cisco* because it did not cause and could not have caused any part of the collision.

### 9. *Burnthorne.*

■ Burnthorne perhaps used poor judgment, but his errors were not the cause of the collision. Burnthorne erroneously advised White that the *Cisco* was at buoy 16, but that misinformation did not contribute to the accident because Burnthorne immediately gave a correct location report to Traffic Service and later directly to White. Burnthorne's even later report that the *Cisco* was "behind 18" was clear, in the pilots' jargon at least, and it meant that the ship was on the north side of the channel and, less certainly, seaward from buoy 18. Burnthorne, further confusing White, suggested that the boat White was looking at in front of the *Sverdlovsk* was a fishing boat.

Burnthorne did not use extraordinary means, like spotlight, flare, or emergency whistle, to help White identify the *Cisco* because he did not realize White's confusion about the *Cisco*'s location endangered his vessel. Burnthorne never responded to any of the *Sverdlovsk*'s whistle signals by whistle, but he responded to the two-blast whistle by radio, making an agreement for an overtaking to his port.

Although a privileged ship is required to maintain its course and speed after having agreed to a maneuver, Burnthorne ordered the *Cisco* full ahead and hard to starboard. These orders were given *in extremis*.

### 10. *Foreign Sovereign Immunities Act.*

■ The United States has eliminated the traditional maritime remedy of an *in rem* seizure of a vessel when it is owned by a foreign sovereign. Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 (1986). *See Brazosport Towing Co. v. 3,838 Tons of Sorghum,* 607 F.Supp. 11, 13 (S.D.Tex. 1984), *aff'd* 790 F.2d 891 (5th Cir.1986). The federal law said in 1987 that, when notice was delivered, the maritime lien claim that would have given rise to the plaintiff's right to seize "shall ... be deemed to be an *in personam* claim against the foreign state." 28 U.S.C. § 1605(b).

Kim Crest complied with the requirements for service of process. 28 U.S.C. § 1605(b)(1). Instead of the traditional seizure as a means of perfecting service of process on the vessel, Kim Crest had to give notice of the suit to the ship by delivering a copy of the summons and the complaint to the person in possession of the vessel against which the maritime lien was asserted. Through its attorney, Kim Crest delivered a copy of the complaint and the summons to the attorney for Baltic Shipping and to the captain of the *Sverdlovsk.* The captain signed and dated a copy and returned it to Kim Crest's counsel.

In addition to serving the ship, the claimant must serve the agency of the foreign state. Among the possible methods, only one was available to Kim Crest. There being no special arrangement between Kim Crest and Baltic Shipping for service, nor international convention between the United States and the U.S.S.R., and no authorized agent in the United States for Baltic Shipping, Kim Crest had the United States District Clerk mail a summons, a complaint, and their translations to Baltic Shipping in the U.S.S.R., return receipt requested. Kim Crest also transmitted a copy of the summons and complaint by telex to Baltic Shipping. The notice was served within the statutory time requirements.

Having perfected service in lieu of seizure, Kim Crest's claim against the *Sverdlovsk in rem* became one *in personam* against the Soviet Union through the Baltic Shipping Company. The principles of law and rules of practice applied by the court are still those of an *in rem* suit. The distinction drawn by the law is one for the cooperative convenience of countries in dealing with each other's vessels; it keeps private litigants from seizing the personified and sovereign part of a foreign country that a national vessel represents.

■ The immunity from seizure does not imply a parallel immunity from liability. The Soviet Union is liable for the damages done by the *Sverdlovsk* to the *Cisco* within the limits of an *in rem* proceeding. The Soviet Union's liability is limited to the value of the *Sverdlovsk.* The exemption from seizure under the statute replaces one method of service for another, but it does not alter the liability.

### 11. *Compulsion.*

■ Although it is an ephemeral distinction in this case, Baltic Shipping is not liable *in personam* because the ship was compelled to accept the pilot who was solely at fault. Pilotage is compulsory in the approaches to the Port of Houston.

> Compensation ... shall be paid by the consignee for vessels employing pilots. If the consignee of a vessel ... declines the services of a pilot offered outside the bar and enters the port without the aid of a pilot, the consignee is liable to the first pilot whose services were declined for the payment of pilotage.

Tex.Rev.Civ.Stat. art. 8280a (1986).

When a vessel must pay for a pilot whether he is used, the statute is a compulsory one, even if the statute has no additional penalties. *See e.g., The China,* 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67 (1868). "The requirement that pilots be paid whether taken or not is sufficient penalty for compulsion." *The Framlington Court,* 69 F.2d 300, 306 (5th Cir.), *cert. denied,* 292 U.S. 651, 54 S.Ct. 860, 78 L.Ed. 1500 (1934). *See also Jackson v. Marine Exploration Co., Inc.,* 583 F.2d 1336 (5th Cir.1978). The pilots were compulsory in another sense; they were assigned to vessels under a rotation determined to suit the pilots, and the vessel had no choice which pilot was as-

signed. Also, neither the *Sverdlovsk* nor its crew had any experience with White that should have alerted them to his limits and caused them to demand another.

■ Baltic Shipping is not liable *in personam* for the errors of a pilot, not its agent, whom it was forced to employ. The ship's liability *in rem*, however, is not relieved by the fault being wholly attributable to the compulsory pilot. *Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); *The China*, 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67 (1868); *Essex County Electric Co. v. Motor Ship Godafoss*, 129 F.Supp. 657 (D.Mass.1955). The *Sverdlovsk's* independent juristic personalty is abrogated to avoid seizure. The ship's liability to compensate is assumed by the owner, even when the owner otherwise would have escaped *in personam* liability. The Soviet Union is liable for the damages that would have been recoverable *in rem* against the *Sverdlovsk*.

### 12. *Property Damage.*

The damage to the *Sverdlovsk* was $25,000.

■ As a direct consequence of the collision, the *Cisco* required general repairs for structural damage, lay-up fuel, hull sandblasting and machinery repairs of $559,802.87. While the *Cisco* was being repaired from the collision, the owners took the opportunity forced on them by the accident to have additional work done. The cost of that work has been segregated, and it is not included in the damage calculation. No evidence was offered that the owner's work delayed its return to service beyond the time required for the accident repairs. Because Baltic Shipping offered no alternative measures of damage, such as the *Cisco's* fair market value immediately before and after the collision, the reasonable cost of repairs compensates the owners adequately on this record.

In making the repairs, the surveyors discovered additional repairs needed on the propulsion equipment, not related to the collision. Kim Crest would like to recover interest for the costs of making these repairs earlier than they would have, had they not discovered the problem until a later date. The final damage determination does not include interest on the advanced maintenance; the repairs needed to be made then, and it is unimportant which fortuity brought the need to the owner's attention.

### 13. *Bottom Paint.*

■ Although only a small part of the hull had to be repainted from the impact of the *Sverdlovsk's* bow, the entire bottom had to be repainted, since all of the existing bottom paint lost its antifouling properties during the drydocking required by the collision. The total cost for repainting was $13,985.30. The cost of the repainting is adjusted for the value of the old paint that had been consumed before the collision. About 75% of the value of the bottom paint had been used, leaving the loss attributable to the collision at 25% of the whole cost of new bottom paint. An additional adjustment of 6% of the cost will be made in favor of the owners because they would not have had to spend the 75% for another eighteen months, leaving them out the interest on the advanced maintenance. The cost of repainting charged to Baltic Shipping will be $4,335.44.

### 14. *Lost Hire.*

■ The *Cisco* was out of service for 83.5 days. A ship owner is entitled to damages for the loss of use of its vessel in addition to the cost of repairs of the vessel. *Continental Oil Co. v. S.S. Electra*, 431 F.2d 391 (5th Cir.1970). The damage that this loss of use represents is the ship's charter rate, less the variable or incremental expenses that would have been required of the owner to perform the charters, discounted by the probable utilization rate. The calculations are complicated because the *Cisco* left service under a charter at a low rate, but by the time it returned to service, the market for this vessel had risen, making a significant difference in the damages depending on how the rate for the period of disability is approximated.

The traditional way to determine consequential damages is the three voyage rule. *The Gylfe v. The Trujillo*, 209 F.2d 386, 389 (2d Cir.1954). Under the three voyage rule the court determines the charter hire rate for the voyage immediately preceding the collision, the charter hire rate during the voyage of the casualty, and the charter hire rate of the first voyage succeeding the casualty and averages them. This rule is just one of several ways to reach a reasonable estimate of the loss, and it is not invariably applied. The rule is inapplicable in a rapidly changing market of charter hire rates. *Quevilly–Sampson*, 1938 A.M.C. 347 (S.D.N.Y.1938).

Around the time of the *Cisco*'s loss, the market rose, and after the repairs were completed, the *Cisco* had several voyage charters before the first time charter. The rapidly fluctuating market in 1987 makes application of the simple three voyage rule inappropriate for the *Cisco*'s damages.

Assuming that the *Cisco* finished the charter it had just begun and had served additional charters averaging twenty-five days each, at the market rate for the beginning of each twenty-five day period of lost service, the lost net hire would have been $225,637.27. The market rates for the beginning of the voyage periods, minus the costs saved by Kim Crest, were $2,414.88, $2,591.86, $2,947.20, and $3,151.62 respectively. Although the historic rate of charter for the *Cisco* was close to 90%, full-time use for the period it was out of service is probable since it was during the beginning of a tight market.

The cost saved by not having to perform the charters only includes the variable cost. Neither the depreciation of the capital asset nor the accrual of general maintenance are saved by the idled vessel; those costs are sunk or fixed, and they are not subtracted to reach the net lost earnings.

### 15. *Interest on the Property Damage.*

■ The physical damage incurred from the collision bears interest from the date of the collision. The interest on the total property damage, determined by the average interest rate for the period, 10.5%, is $185,817.89, through the date of judgment. It does not matter when, or indeed whether, the owners had the vessel repaired or paid for those repairs. The question is: What is the diminution in value inflicted on the property by the collision. Full compensation requires that the valuation of the physical loss bears interest from the date the loss was incurred. In the event of a total loss, the owner would be obliged by the contrary rule to replace the lost vessel before interest could run on his loss.

### 16. *Interest on the Lost Hire.*

■ Unlike the property damage, the damage component of lost hire would not have fully accrued at the time of the collision. The income to be replaced would have been earned as the period of lost use passed, the full amount accumulating by the date of the ship's return to service. Lost hire, absent other evidence, should be viewed as having accrued evenly from the casualty to the return to service, generating interest due on an increasing sum. To avoid complex calculations with minimal variations in the result, it is legally and economically sound to apply the whole interest rate for the period to one-half of the whole amount of lost hire, reflecting the average outstanding amount over the period. The interest on the lost hire through the date of judgment is $71,268.85.

### 17. *Conclusion.*

A judgment will be entered against the Baltic Shipping Company as an agent of the Soviet Union for the lost hire and property damage caused by White's faulty pilotage. The liability is limited to that that would have been borne by the ship itself.

### FINAL JUDGMENT

Kim Crest, S.A., recovers from Baltic Shipping Company, as an agent of the Union of Soviet Socialist Republics:

1. Property damage:
   A. General $559,802.87
   B. Bottom Paint $4,335.44

2. Prejudgment interest for property damage $185,817.89;

3. Lost hire $225,637.27;

4. Prejudgment interest for lost hire $71,268.85;

5. Postjudgment interest at 7.28% per annum; and

6. Costs of court.

Kim Crest, S.A., recovers nothing from the M.V. *Sverdlovsk.*