United States Court of Appeals,

Fifth Circuit.

No. 92-3556.

AVONDALE INDUSTRIES, INC., Plaintiff-Appellant,

v.

INTERNATIONAL MARINE CARRIERS, INC. and The United States of America, Defendants-Appellees.

March 4, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before KING and JOLLY, Circuit Judges, and PARKER,[1] District Judge.

ROBERT M. PARKER, District Judge:

Avondale Industries Inc. (Avondale) brought a maritime tort and contract action against the United States and its vessel operator, International Marine Carriers, Inc. (IMC) for allision damages to Avondale shipyard property which occurred on November 18, 1989.

The United States counterclaimed against Avondale for damages suffered by the USNS BELLATRIX, the vessel involved in the allision, and for contractual indemnity on the Avondale claim.

The matter was tried by the district court sitting without a jury. The district court issued a judgment on June 3, 1992 dismissing Avondale's claims and awarding the United States $637,380.00 in damages. Avondale is before this Court appealing both the dismissal and the damage award.

FACTS

USNS BELLATRIX is a 946 foot long steamship owned by the United States Navy. She is fitted with two 60,000 horsepower steam engines each driving a separate propeller. IMC contracted with the Navy's Military Sealift Command to operate and maintain the vessel. As a part of IMC's services to the Navy, IMC took bids and awarded contracts for the routine dry docking and regular "topside" repairs and maintenance of the BELLATRIX in the Fall of 1989.

_____

[1]Chief Judge of the Eastern District of Texas, sitting by designation.

Avondale was awarded the contract. Avondale provided tugs, pilots and line handlers to BELLATRIX, towing her dead ship from her berth in Violet, Louisiana to the Avondale shipyard on the Mississippi River. This initial movement and a subsequent return to Violet were part of the original contract. Later, it was determined that BELLATRIX's topside repairs were to be performed by a shipyard located in Jacksonville, Florida.

On November 18, 1993, Avondale had completed its repair work on the vessel. The BELLATRIX was towed, dead ship, out of dry dock by two tugs, AVON II, owned by Avondale and MISS SARAH, hired by Avondale from E.N. Bisso and Son. A third tug, PEGGY H., also hired by Avondale from Bisso, stood by unattached. The dry dock was parallel to shore and BELLATRIX's bow was pointing upriver. After the repairs were completed, the tugs towed the BELLATRIX, dead ship to the opposite side of the Mississippi River and held her there with her bow pointed upstream while she took on water ballast and made steam. Ballasting was necessary to lower the vessel in the water to allow her to pass under overhead electric cables and the Huey Long Bridge.

BELLATRIX was manned by IMC employees, including Captain Rivera and his crew. A compulsory pilot, Pilot Thomas, was also on board during the ballasting and turning of BELLATRIX, as required by law. Avondale, as part of the contract, hired and paid Pilot Thomas. Captain Rivera discussed the vessel's handling characteristics with the pilot when he came on board before BELLATRIX left the dry dock. Both Captain Rivera and Pilot Thomas stayed on the bridge throughout the subsequent maneuvers. Pilot Thomas gave all the orders and Captain Rivera, although nearby, had turned his attention to the repair of a faulty instrument.

The engines were placed on standby at 0754 hours. Ballasting was completed at about 0810 hours. At approximately 0816 hours, before the down river turn was started, the chief engineer reported to third mate Barton, who immediately notified Captain Rivera and Pilot Thomas, that the starboard engine was unavailable for use. Pilot Thomas determined that BELLATRIX could be turned with the port engine and the assisting tugs, without the starboard engine and proceeded, knowing it was unavailable. The port engine was kept dead slow astern, which had the effect of slowly turning the BELLATRIX to the left until she was perpendicular in the river with her bow

pointed at the Avondale facility.

At this time, Pilot Thomas released MISS SARAH from the bow. Unbeknownst to Captain Rivera and the crew on the bridge, Pilot Thomas previously allowed the tug AVON II to cast off from the stern because she was having a problem with her lines to the BELLATRIX. Because of the configuration of BELLATRIX's bridge, the stern was not visible from the bridge, so Captain Rivera could not have seen the release of the AVON II. In compliance with Pilot Thomas' direction, one of BELLATRIX's crew members had released AVON II's lines. He reported his action to the bridge, but did not get confirmation that the message was received, as he was required to do. The message was not received by the bridge and Pilot Thomas did not tell Captain Rivera about releasing AVON II.

At 0828, while the vessel was still perpendicular in the river, Pilot Thomas ordered dead slow ahead on the port engine, which was followed by a slow ahead at 0829 hours and full ahead at 0831 hours. The rudder at this time was at hard left.

It soon became clear that the ship could not make the turn. Pilot Thomas tried to call the MISS SARAH back to the vessel to assist, but the tug could not make it back. The port engine remained on full ahead until 0834 hours, when Pilot Thomas ordered full astern on the port engine and drop anchor. At 0836 hours, the BELLATRIX made contact with Avondale's dry dock.

## STANDARD OF REVIEW

Avondale challenges both the findings of fact and the conclusions of law entered by the district court. In an admiralty action tried by the court without a jury, the factual findings of the District Court are binding unless clearly erroneous. *Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401 (5th Cir.1982). Questions concerning the existence of negligence and causation are treated as factual issues subject to the clearly erroneous standard. *Todd* at 405.

Questions of contract interpretation, as well as all other questions of law are subject to *de novo* review. *Dow Chemical Company v. M/V ROBERTA TABOR,* 815 F.2d 1037, 1042 (5th Cir.1987).

## CAUSATION

The district court found that the casualty was caused by Pilot Thomas because he (1) failed to wait until the BELLATRIX had both of her engines available before commencing the left turn down river; (2) prematurely released the AVON II from the turning maneuver; and (3) released the MISS SARAH before the BELLATRIX fully completed her turn and was safely headed down river. The district court further found that no act or omission on the part of Captai n Rivera or his crew contributed to the accident. Appellant, Avondale, does not challenge the finding that Pilot Thomas' negligence was a cause of the allision. Rather they contend that they affirmatively showed that the loss or damage to the BELLATRIX was also proximately caused by the acts and omissions of Captain Rivera and his crew.

In order to determine the causation question, we must first explore the relationship between and relative responsibilities of the master of a ship and a compulsory pilot. In *The CHINA,* 74 U.S. 53, 7 Wall. 53, 19 L.Ed. 67 (1868) the Supreme Court held that the master has a duty to intervene when a compulsory pilot is on board only "in cases of the pilot's intoxication or manifest incapacity, in cases of danger he does not foresee, and in all cases of great necessity." After a discussion of then existing authority the Supreme Court concluded:

> The statute giving the immunity [to a vessel and her owner] where a licensed pilot is employed, abridges the natural right of the injured party to compensation, and is therefore to be construed strictly.
>
> The exemption applies only where the pilot is actually in charge of the vessel, and solely in fault.
>
> If there be anything which concurred with the fault of the pilot, in producing the accident, the exemption does not apply, and the vessel, master, and owners are liable.
>
> The colliding vessel is in all cases prima facie responsible. The burden of proof rests upon the party claiming the benefit of the exemption. He must show affirmatively that the pilot was in fault, and that there was no fault on the part of the officers or crew, "which might have been in any degree conducive to the damage'.

The pilot's responsibilities are broad and he supersedes the master for the time being in the command and navigation of the ship and his orders must be obeyed in all matters connected with navigation. However, "the master is not wholly absolved from his duties while the pilot is on board and may advise him and even displace him in case he is intoxicated or manifestly incompetent. He is still in command of the vessel, except so far as her navigation is concerned, and bound to see that

there is sufficient watch on deck and that the men are attendant to their duties." *The OREGON,* 158 U.S. 186, 194-195, 15 S.Ct. 804, 808, 39 L.Ed. 943 (1895).

The master is entitled to assume that the pilot is an expert on local conditions and practices, until it becomes manifest that the pilot is steering the vessel into danger. *Kim Crest, S.A. v. M/V SVERDLOVSK,* 753 F.Supp. 642, 646 (S.D.Tex.1990). In *M/V SVERDLOVSK,* the master did intervene and take responsibility away from the pilot, but not early enough to prevent the collision. Although that court's discussion of whether the master was negligent in not intervening earlier is very fact specific, and distinguishable from the case before us, *M/V SVERDLOVSK,* supports the conclusion that the master has a responsibility to monitor the pilot's decision making. If the master's responsibility to intervene in cases of great necessity means anything, it must require that he have an adequate level of information to determine when "great necessity" arises. Captain Rivera's omission was not simply in failing to intervene, but rather in failing to pay attention so that he would know that he needed to intervene. His responsibility to observe and ask questions increased as the margin of error decreased. The original plan was to turn the BELLATRIX with three tugs and two engines. Prior to the allision, Captain Rivera was aware that the turn was being attempted with one failed engine and one tug (which in fact had also been released.)

The master and the pilot both testified, without contradiction in the record, that the master was in charge at all times. The master testified that he has countermanded a pilot's orders on previous occasions during his command of the BELLATRIX and that he would have done so in this case had he known that the AVON II had been released.

Appellees argue, without authority, that it would set dangerous precedent to require the master to intervene to avoid a finding of negligence, as masters should normally rely on the greater knowledge and familiarity of the local pilot. This Court is not convinced that finding the master negligent in this situation would disrupt the normal reliance on pilots by masters.

It is clear in the evidence that the master failed to monitor the progress of the turn and failed to intervene when it was necessary to avoid the allision.

Further, testimony established that when the pilot released the AVON II, the tug captain told

the first mate to let her go.  The first mate did release her, and reported his action to the bridge.  However because of noise and static interference, the information was not received on the bridge or acknowledged.  The first mate made no further attempts to communicate the information to the bridge.  Captain Rivera properly had standing orders that such information should be repeated until acknowledgement is received.  Captain Rivera's testimony that he would have countermanded the pilot's order to release the MISS SARAH if he had known that the AVON II had already been released, convinces us that the first mate's negligence was also a proximate cause of the allision.

For these reasons, we are convinced that the district court's finding that no act or omission on the part of Captain Rivera or his crew contributed to the accident is clearly erroneous.

THE CONTRACT

IMC, as agent for the United States entered into a contract with Avondale that, among other things, altered the normal maritime liability scheme by setting out which party would be responsible for damages that occurred during the course of the contract.  Under the heading *Contractor Responsibilities and Insurance,* the parties agreed as follows:

> 11(d) The Contractor [Avondale] hereby indemnifies and holds harmless the Government, its agencies and instrumentalities, the vessel and the Operator, against all suits, actions, claims, costs or demands (including, without limitation, suits, actions, claims, costs or demands resulting from death, personal injury and property damage) to which the Government, its agencies and instrumentalities, the vessel or the Operator may be subject by reason of damage or injury (including death) to the property or person of anyone other than the Government, its agencies, personnel and instrumentalities, the vessel or the Operator, arising or resulting from the default, negligence, wrongful act, or omission of the Contractor or any subcontractor, his or their servants, agents, or employees.

> 11(e) The Contractor shall be responsible for and make good at his own cost and expense any and all loss of, or damage of whatsoever nature to, the vessel (or portion thereof), its equipment, movable stores and cargo, and Government owned materials and equipment for the repair, completion, alteration or addition to the vessel in the possession of the Contractor, whether at the Contractor's plant or elsewhere, arising or growing out of the performance of the work, *except where the Contractor can affirmatively show that such loss or damage* was due to causes beyond the Contractor's control, *was proximately caused by agents or employees of the Operator or the Government,* or which loss or damage the Contractor by the exercise of reasonable care was unable to prevent;  provided that the Contractor shall not be responsible for any such loss or damage discovered after completion of the work and redelivery of the vessel to the Operator, unless (i) such loss or damage is discovered no more than 90 days after completion of the work and such redelivery, and (ii) such loss or damage is affirmatively shown to have been the result of the fault or negligence of the Contractor.  (emphasis added)

AVONDALE'S CLAIM FOR DAMAGES UNDER THE CONTRACT

Under clause 11(d), Avondale must indemnify the Government and IMC against damages to the dry dock and barges caused by the negligence of its subcontractors. It is therefore necessary to determine if Pilot Thomas was Avondale's subcontractor.

Avondale contends that Pilot Thomas was an independent contractor and therefore Avondale is not precluded from recovering for damages caused by the allision. The Appellees contend here, as they did below, that Pilot Thomas was Avondale's subcontractor, and that Avondale must therefore indemnify the Government and IMC for the damages. The district court found that Pilot Thomas was not an independent contractor, and that Avondale was therefore not entitled to recover from the Government and IMC for damages to the dry dock and the barges.

A subcontractor is one who takes a portion of a contract from the principal contractor or another subcontractor. *Hardware Mut. Casualty Co. v. Hilderbrandt,* 119 F.2d 291 (10th Cir.1941). The record reflects that Avondale contracted to provide "tugs, pilots, [and] linehandlers." Pilot Thomas then contracted with Avondale to perform the piloting duties that Avondale was obligated to provide under the contract. Pilot Thomas was a subcontractor for purposes of the indemnity clause of the contract. The lower court's discussion concerning whether or not Thomas could be considered an independent contractor is irrelevant to this analysis. The two terms are not mutually exclusive. A subcontractor may or may not have an agency relationship with the contractor and that relationship does not control whether or not a subcontract has been struck.

Based on the conclusion that Pilot Thomas was Avondale's subcontractor, Avondale is precluded by paragraph 11(d) of the contract from recovering from the Government and IMC the damages to its facilities caused by the negligence of the pilot.

When two or more parties have contributed by their fault to cause property damage in a maritime collision, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. If the parties are equally at fault or when it is not possible to fairly measure the comparative degree of their fault, liability for such damage is to be allocated equally. *United States v. Reliable Transfer Company, Inc.,* 421 U.S. 397, 409-411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251, 262 (1975), *Sincere Navigation Corporation v. United States,* 529 F.2d 744

(5th Cir.1976). Under these comparative negligence provisions of general maritime law, Avondale is entitled to recover from the Government that portion of the damages to the Avondale facilities caused by the negligence of the Government's agents.

THE GOVERNMENT'S CONTRACT CLAIM AGAINST AVONDALE FOR DAMAGES TO THE VESSEL

Pursuant to clause 11(e), set out above, Avondale is responsible for the damage to the vessel, arising or growing out of the performance of the work, unless the damage was proximately caused by agents or employees of IMC or the Government.

First we must determine whether the turning maneuver was part of the services contemplated by the contract. We conclude that is was. The record demonstrates that Avondale contracted to provide services of tugs, a pilot, and linehandlers during the turn.

Second, Avondale has affirmatively shown that a portion of the damage to the vessel was proximately caused by agents and employees of the Government and IMC. The "except" clause of paragraph 11(e) of the contract does not require Avondale to show that acts or omissions of the agents and employees of the Government and IMC were the sole proximate cause of the damage, and indeed, in this case they were not. Having found that acts and omissions of the master and crew of the BELLATRIX were a proximate cause of the allision, we conclude that Avondale is not responsible for that portion of the damage to the vessel proximately caused by the Government's agents or employees, even if that damage arose or grew out of the performance of the contract. Therefore, under the contract, Avondale is responsible only for that portion of the damage not proximately caused by the government.

LIABILITY FOR PILOT NEGLIGENCE UNDER GENERAL MARITIME LAW

The United States also makes a claim against Avondale for damages to the vessel under general maritime law. Having found that the contract controls the relationship of the parties in so far as responsibility for the negligence of Avondale's subcontractors, and the master and agents of the United States is concerned, we need not reach the question of how the United States' claim would be decided under general maritime law.

CONCLUSION

We REVERSE the lower court's finding that no action or omission of the master and crew contributed to the allision. The government is liable to Avondale for damages to Avondale's facilities to the extent of the fault attributable to the government. The contract provision making Avondale responsible for damages to the vessel arising out of the performance of the contract imposes liability on Avondale for that portion of the damages not proximately caused by the Government, its agents or employees.

Based on the foregoing, the judgment for the United States in the amount of $637,380.00 is VACATED. The judgment for IMC and the United States, dismissing Avondale's claim for damages is REVERSED. The case is REMANDED, in order that the district court may determine the appropriate apportionment of damages to each party under the rule of comparative negligence.