**CROWLEY AMERICAN TRANSPORT, INC., Plaintiff,**

v.

**DOUBLE EAGLE MARINE, INC., Crescent Towing & Salvage Co., Inc., Moran Towing of Texas, Inc., Petroleum Transport Corp., and Falgout Bros., Inc., Defendants.**

**No. CA 00–0058–C.**

United States District Court, S.D. Alabama, Southern Division.

April 4, 2002.

---

Joe E. Basenberg, Jaime W. Betbeze, Hand Arendall, L.L.C., Mobile, AL, for Crowley American Transport, Inc.

Gregory C. Buffalow, Miller, Hamilton, Snider & Odom, Mobile, AL, for Double Eagle Marine, Inc., Falgout Bros., Inc.

William M. Moore, Mobile, AL, for Crescent Towing & Salvage Co., Inc.

Mary Campbell Hubbard, Fowler, Rodriguez, Kingsmill, Flint & Gray, L.L.P., New Orleans, LA, David M. O'Brien, Fowler, Rodriguez & Chalos, Mobile, AL, for Moran Towing of Texas, Inc., Petroleum Transport Corp.

## MEMORANDUM OPINION AND ORDER

CASSADY, United States Magistrate Judge.

This admiralty action came on for a bench trial before the undersigned on

April 23–25, 2001. The parties expressly consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings, including the aforementioned bench trial. (*See* Doc. 110 ("In accordance with [the] provisions of 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.")) Upon consideration of the testimony of all witnesses and the briefs of the parties, the Court enters the following findings of fact and conclusions of law.[1] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such and to the extent any of the Court's conclusions of law constitute findings of fact, those are adopted as such.

### FINDINGS OF FACT

1. The barge MASSACHUSETTS, a heavy oil barge captained by David Nelson, was towed by the tugboat ROLAND FALGOUT from Tampa, Florida to the Atlantic Marine shipyard in Mobile, Alabama for routine maintenance.[2] The ROLAND FALGOUT was made up to the barge with its towing hawser. The tug and barge left Tampa at approximately 6:30 a.m. on March 16, 1999 and arrived at the sea buoy roughly seven miles south of Dauphin Island at approximately 1:00 a.m. on March 18, 1999.

2. Captain John C. Gray, a Mobile bar pilot for the last fifteen to twenty years, boarded the ROLAND FALGOUT at the sea buoy at approximately 2:15 a.m. to assist in the towage of the MASSACHUSETTS into Mobile harbor. Gray understood his duties as pilot were to guide the flotilla up the Mobile Bay ship channel and direct the docking of the barge at the Atlantic Marine shipyard. A pilot like Gray does not have complete command of the tugboat but instead is an advisor to the master (captain) of the vessel and can be overruled by the master of the vessel at any time. The visibility upon Gray boarding the tug was good; there was no fog in the area.

3. Three assist tugboats owned by Crescent Towing, the ALABAMA, the

---

1. To the extent explicit rulings need be made respecting the various motions for summary judgment filed in this case (*see* Docs. 52 & 65), same are **DENIED.** However, it is the conclusion of the undersigned, upon consideration of all the evidence, that the assist tugs owned by Crescent Towing & Salvage Co., Inc. were not negligent in any manner and therefore, are not liable for any of the damages accrued herein.

 Any and all remaining pre-trial motions filed by the parties (*see* Doc. 87 (Falgout and Double Eagle's objection to Moran exhibit list); 90 (Falgout and Double Eagle's objection to expert testimony); 91 (Falgout and Double Eagle's objection to expert qualifications); 120 (Falgout and Double Eagle's objection to two Moran witnesses as untimely); 121 (Falgout and Double Eagle's motion to dismiss)), save for Moran's motion to file supplemental findings of fact and conclusions of law (Doc. 111), are **DENIED** unless otherwise granted during the bench trial. Moran's pretrial motion to file supplemental findings of fact and conclusions of law is **GRANTED** over the objection of Falgout and Double Eagle (Doc. 112).

 Finally, the undersigned notes that during the first day of the bench trial on April 23, 2001, Moran Towing of Texas, Inc. and Petroleum Transport Corp. (collectively "Moran") withdrew their claim against plaintiff Crowley and the 407 barge for damage to the barge MASSACHUSETTS (owned by Petroleum Transport and operated by Moran).

2. The barge was cleaned and gas freed in Tampa.

MARDI GRAS, and the BIG BEAR, met up with the MASSACHUSETTS in the vicinity of beacon 72 in the Mobile ship channel and/or a mile or two south of the sea buoy. The ALABAMA, a twin screw tug captained by Ronald Walker, was asked by the captain of the ROLAND FALGOUT to make up to the notch of the MASSACHUSETTS[3] and the MARDI GRAS, captained by Michael Yarbrough, was ordered to put up a headline to the starboard bow of the barge.[4] The BIG BEAR was positioned to the starboard stern of the MASSACHUSETTS but was not made up to the barge like the ALABAMA and MARDI GRAS. The three assist tugs were present to assist in the docking of the MASSACHUSETTS at the Atlantic Marine shipyard.

4. As this flotilla proceeded northward up the Mobile ship channel favoring the east side of the channel, not only did fog set in but, in addition, all three tug captains made up to the MASSACHUSETTS and the pilot of the ROLAND FALGOUT were aware that the tugboat CHOCTAW EAGLE, with the barge Crowley 407 in tow, was coming up behind their flotilla in the river.[5] Michael Yarbrough, captain of the MARDI GRAS, testified that he was informed by the company dispatcher that Crescent Towing was assisting two inbound tows that morning, the Crescent tug assisting the CHOCTAW EAGLE and the barge Crowley 407 being the ERVIN COOPER.[6]

5. As the MASSACHUSETTS flotilla got abeam of the dock at the Atlantic Marine shipyard, fog conditions were such that one could not see across to the other side of the river but one could see the dock. At this point in time, the barge MASSACHUSETTS was approximately 100 to 150 feet from the dock,[7] rather than laying starboard side against pier L as testified to by the pilot. The pilot admitted he did not actually see the barge against the dock and his explanation about what convinced him he was alongside the dock is not convincing.

6. As part of the docking procedure, all parties involved were cognizant that the tug ROLAND FALGOUT would be dropping the towing hawser and that when that happened, the assist tugs made up to the MASSACHUSETTS would have actual physical control over the barge in order to maintain the position of the barge. It is also clear, however, that the assist tugs were relying on instructions from the person in control of docking regarding what they were to do in order to hold the MASSACHUSETTS in place.

7. Just prior to the release of the towing hawser, the barge captain, Nelson,

3. The ALABAMA actually put a headline up to the barge to tie itself in.

4. An assist tug made up to a barge initially just hangs on and is towed along with the barge (in neutral gear) and this condition only changes upon the assist tug being given specific instructions to use its rudder or engine.

5. The captain of the MASSACHUSETTS was unaware of any traffic coming upriver behind their flotilla because, as testified to by Robert Ortega, a tankerman on the barge, the barge does not monitor outside traffic.

6. The ERVIN COOPER was captained by Henry "Bo" Tucker, Jr. According to Tucker, the destination for this flotilla was Bender's Yard 3 on the west side of the river where the barge Crowley 407 was to undergo routine maintenance. This flotilla was approximately one-half mile behind the MASSACHUSETTS flotilla.

7. The barge never got close enough to the dock to put a line to it.

communicated to the tug pilot and/or captain that he was ready and in position for the release. The pilot actually instructed the tow captain, Earl P. Gisclair, to take his tow line off. In releasing the towing hawser, the ROLAND FALGOUT winched in all their towing gear and the barge's towing gear onto their back deck, knocked the pin out thereby freeing the barge's gear and dropping it into the water. A few minutes after the pin was knocked out, Nelson informed the captain of the ROLAND FALGOUT, that he had gotten the shock line out of the water.[8] It took another three to seven minutes for the barge crew to retrieve all of its towing gear out of the water from the starboard side of the barge.

8. While the crew of the MASSACHU-SETTS was retrieving its towing gear the ROLAND FALGOUT was supposed to be repositioning itself into the notch so that it could assist in completing the docking operation, or, alternatively, was to reposition itself to assist in the docking of the barge after it retrieved its towing gear from the

water.[9] However, during this five to ten minute time frame "shut out" fog set in and everything blacked out; the ROLAND FALGOUT couldn't see the MASSACHU-SETTS and vice versa. The Court finds that it was when the "shut out" fog first set in and Gray lost sight of the MASSA-CHUSETTS that the pilot of the RO-LAND FALGOUT communicated to the assist tugs that the barge captain was taking over the docking of the barge.[10] No one other than Gray heard the barge captain explicitly state that he was taking over the docking of the barge and therefore, the Court finds that the barge captain never made such statement.[11]

9. After the towing gear had been retrieved and Nelson was unable to see the dock or the tug he assumed that the barge was drifting. Moreover, the captain of the assist tug MARDI GRAS, Michael Yarbrough, told Nelson that they were drifting. Nelson communicated with the ROLAND FALGOUT about the tug's location [12] and was told by the tug that it had lost sight of the MASSACHU-

8. To the extent the barge captain ever stated "I got it" such statement was made solely in reference to retrieving the barge's shock line or remaining towing gear and having the dock in sight.

9. Even if this Court was to find that it was the crew of the ROLAND FALGOUT retrieving its gear from the water rather than the barge, the same five to ten minute period passed after which neither vessel could see the other. Clearly, the crews of both vessels were busy with the towing gear and did not recognize until the passage of five to ten minutes that "shut out" fog had set in.

10. This is consistent with the attitude the pilot adopted when he eventually boarded the barge and navigated it into the slip, Gray refusing to speak to the barge captain when Nelson tried to question him about what had happened. Moreover, this conclusion is sup-

ported by Gray's own testimony that he kept the clock running on his services rendered even though he allegedly had been released from duty. Finally, the Court is justified in rejecting Gray's testimony in this regard since this is the only conversation of the many Gray had that day in which the pilot recalls the specific comments made.

11. In fact, the captain of the ROLAND FALG-OUT, Earl Gisclair, testified that there was no talk between the pilot and barge captain regarding the barge captain taking over the docking and that the pilot told Gisclair to take off his tow line and get into the notch of the barge.

12. Gisclair remembered Nelson hollering over the radio several times that he could not see the dock and was lost in the fog.

SETTS.[13] At this point, Nelson was of the opinion and the evidence establishes that the ROLAND FALGOUT had abandoned the MASSACHUSETTS and therefore, the captain of the MASSACHUSETTS was thrust into the unfamiliar position of having to communicate and give orders to the assist tugs.

10. It is clear that the captain of the ROLAND FALGOUT was responsible, by his own admission, for the MASSACHUSETTS until it was docked but relied upon the pilot to direct the docking. Of course, the pilot never touched the tug captain's wheel but simply advised the captain and the tug captain could stop the pilot if he disagreed with the docking procedure. Gisclair testified that he depended upon the pilot to tell him what to do and that before the tug could reposition his tug in the notch of the barge, the tug lost the barge in the fog. The tug sounded no fog signals nor did the tug captain make a security call on the radio saying his barge was loose. In particular, Gisclair did not contact the CHOCTAW EAGLE and inform that tug that his barge was on the loose because at that point in time the CHOCTAW EAGLE was already halfway across his tow when the barge got loose.

11. The captain of the CHOCTAW EAGLE, Tony S. Verdin, made an agreement with the pilot of the ROLAND FALGOUT, Gray, that would allow his flotilla to pass on the port side of the ROLAND FALGOUT flotilla while same was abeam of the dock and the barge was being held in place. The "shut-out" fog set in right when the captain of the CHOCTAW EAGLE started to pass the ROLAND FALGOUT flotilla. Verdin never looked again at his radar for the barge because it was supposed to be against the dock and, in addition, the collision "happened so fast[.]" Verdin surmised that since he did not have a visual of either the MASSACHUSETTS or the ROLAND FALGOUT when he started his passing maneuver it would have been appropriate for him to call the other flotilla and confirm or otherwise give the other flotilla a signal so that it would know exactly where he was when he started his passing maneuver. It was also Verdin's testimony that it would be both towing tugs' responsibility to maintain visual or other form of contact during the passing maneuver. Finally, he testified that it would have mattered to him had he known, prior to beginning his passing maneuver, that the towing hawser had been released because this would have told him the barge was loose.

12. Within a matter of five or fewer minutes after being unable to see the dock or the ROLAND FALGOUT, the MASSACHUSETTS was carried by the current into the barge Crowley 407. The current was strong, at approximately one knot, but was not moving in a direction to hold the barge against the pier as testified to by Gray but rather, was moving in the opposite direction and, based on the testimony of Falgout's navigational expert, Warren Norville, would have carried the barge approximately 1,000 feet in ten (10) minutes.

11. The MASSACHUSETTS collided with the barge Crowley 407 (as well as the 407's assist tug ERVIN COOPER) within fifteen minutes of the ROLAND FALGOUT releasing its towing hawser to the MASSACHUSETTS. Under the circumstances, including the blackout fog, the ROLAND FALGOUT's abandonment of the MASSACHUSETTS, the barge captain's lack of experience with dropping anchor in absence of direction from a tugboat

13. Nelson also asked the assist tugs for help and was told that they could not see anything.

captain or pilot,[14] the swift current, and the short duration between the barge captain's realization that he had been abandoned and the collision, the Court finds that the failure of the MASSACHUSETTS to drop its anchor, on its own without direction from the tug captain, was not the outstanding contributory cause of the collision. Even though Nelson admitted that he could have dropped anchor, given the plethora of new circumstances that he was faced with in a small window of time, the Court declines to find the barge MASSACHUSETTS primarily responsible for the collision. Nevertheless, the barge captain's failure in this regard, as well as the failure of the MASSACHUSETTS to give a distress signal, establishes that the owner of the MASSACHUSETTS, Moran Towing of Texas, Inc., should bear a modicum of responsibility for the collision.

14. While it is clear that the assist tugs made up to the MASSACHUSETTS never communicated on their company channel with their sister tug the ERVIN COOPER, which was made up to the barge Crowley 407, that the MASSACHUSETTS was adrift, there is no evidence that the captains of the MARDI GRAS and ALABAMA knew the exact whereabouts of the barge Crowley 407 flotilla and that it posed a risk, until moments before the collision,[15] but more importantly all the

captains testified to a man that an assist tug takes no action without receiving instructions from the person in charge of the flotilla. Therefore, the assist tugs MARDI GRAS and ALABAMA were not at fault for failing to communicate with the ERVIN COOPER.

15. Both barges were damaged as a result of the collision. Richard D. Carmack, a private marine surveyor, conducted a field survey of damages to the barge Crowley 407 on March 18, 1999.[16] The damages to the barge Crowley 407 as a result of the collision with the MASSACHUSETTS were "set-ins," crimping and/or distortions of five areas of the barge. (*See* Plaintiff's Exhibit 1, at 3) While the cost estimate from Bender's shipyard for repairs to these five areas came in at $36,392.00, the actual cost of the repairs was $35,967.00.[17] The average monthly interest Crowley has paid on this $35,967.00 is 9.11%.

16. Claude Pritchett performed a damage survey of the MASSACHUSETTS on March 18, 1999 as senior surveyor for Hull & Cargo Surveyors out of New Orleans. The damage to the MASSACHUSETTS caused by the collision with the barge Crowley 407 consisted of an approximately twenty foot by six foot set-in area.[18] In addition, an admittedly preexisting dimple

---

14. It was Robert Ortega's testimony that the MASSACHUSETTS had never been anchored without a tug.

15. Yarbrough did not see the CHOCTAW EAGLE and its tow until right before the collision and at that time he was backing down on orders of the barge captain.

16. Carmack's invoice for services rendered came to $1,156.00.

17. These repairs were made concurrently with regularly-scheduled maintenance on the barge Crowley 407.

18. Chris G. LaBure, owner and principal surveyor of United Marine Surveying, participated in the joint survey of both barges on March 18, 1999 for Falgout Brothers and/or Double Eagle Marine, Inc. and concluded that only the twenty by six foot area of damage to the MASSACHUSETTS occurred during the collision with the barge Crowley 407 and that because a resurvey was not done respecting the eight by four foot set-in area once water was pumped out of the tank, he could make no final determination that this area of damage was a result of the collision. Because a resurvey was not performed, and also because

was required to be repaired by the American Bureau of Shipping ("ABS"), a classification society,[19] while the repairs were being made to the twenty by six foot set-in. The final repair cost was $56,622.00.[20] The repairs were made at the Atlantic Marine shipyard concurrent with general maintenance of the vessel and therefore, Moran makes no claim for loss of profits or loss of use of the barge. Moran was not required to take the MASSACHUSETTS to the opposite side of the river and have the repairs made at Bender's shipyard, after (or before) general maintenance was performed on the MASSACHUSETTS at Atlantic Marine shipyard, particularly in absence of any evidence that the steel used to repair the damaged areas of the MASSACHUSETTS was exactly the same type, size and weight of the steel used to repair the barge Crowley 407.[21]

■■ 17. The Court finds, consistent with the explicit testimony of John W. Klotz, a nautical inspector and expert witness, as well as the implicit testimony of Gisclair, captain of the ROLAND FALGOUT, that the ROLAND FALGOUT was responsible for the barge MASSACHUSETTS from the time it left Tampa, Florida on March 16, 1999 until the time it arrived in Mobile, Alabama on March 18, 1999 and was totally secured by docking or the like where it no longer represented a hazard to navigation. The pilot is there as an advisor to the captain of the tug and does not relieve the tug captain of his responsibilities as master and the tug captain has ultimate responsibility for his tug and his tow. In fact, if the pilot relinquishes his responsibilities the captain must take over and continue the job. In this case, Gisclair gave up control of the

rust was present in this second set-in area, the Court finds that Moran has not established its burden of showing that this damage occurred as a result of the collision with the barge Crowley 407.

Excluding this damage and the preexisting dimple, LaBure made an estimate of repair costs to the twenty by six foot area by taking an average of steel weight repairs from the east side of the river at Bender Shipyard and came up with a repair cost of $21,762.00.

The amount of steel plate for which Moran was charged and is claiming did not differ from the amount of steel estimated in the joint survey, the joint estimate being approximately 5,196 pounds and the steel actually used being approximately 5,657 pounds. LaBure admitted that the difference could be accounted for by the fact that the thickness of the steel used to repair the twenty by six foot area was three-quarter inch steel rather than one-half inch steel as estimated in the joint field survey. According to LaBure, 357 pounds were for the preexisting dimple and 3,574 pounds for the twenty by six foot area of damage. LaBure multiplied the 3,574 pounds by an average price per pound of steel of $4.69 and then added an additional $5,000 for staging, testing, etc., to come up with a total estimated repair cost of $21,762.00. La-

Bure admitted that the angle frames on the MASSACHUSETTS that had to be repaired required more labor than stamped out frames.

19. William B. Watt, a marine surveyor at ABS, required the repair of this preexisting dimple due to its proximity to the twenty by six foot area of damage at the time those other repairs were made. According to Watt, the ABS would not have required repair of the dimple if there has been no other damage in that area.

20. Pritchett's invoice for survey services rendered totaled $1,556.37.

While Moran, in its response to the post-trial brief filed by Falgout Brothers and Double Eagle Marine (Doc. 127), makes a claim for the cost of the survey performed by ABS ($810.00) this cost is disallowed due to the failure of Moran to establish same during the bench trial through the testimony of Watt.

21. In fact, the evidence presented was to the contrary. For instance, compound curve went into the MASSACHUSETTS while flat plate went into the barge Crowley 407.

barge before it was adequately secured and therefore, the primary responsibility for the barge's failure to drop anchor must be shouldered by the owner of the ROLAND FALGOUT because Captain Gisclair should have ordered the barge captain to drop anchor. Moreover, Gisclair should have used his bridge to bridge radio to announce that the barge was lost or given orders to the assist tugs. The CHOCTAW EAGLE was at fault for traveling in "shut-out" fog without sounding fog signals, for failing to use his radar to the fullest extent to keep track of the ROLAND FALGOUT flotilla, and for failing to communicate with the ROLAND FALGOUT flotilla to determine exactly where they were. The barge MASSACHUSETTS was not required to sound fog signals because at all times there was a tug in the notch pushing the barge ahead.[22] The Crescent tugs did not violate any rules of navigation.

18. The Court disagrees with Falgout Brothers, Inc.'s expert on navigational issues, Warren R. Norville, that under the circumstances in this case that the outstanding contributing cause of the collision was the failure of the MASSACHUSETTS to drop anchor immediately upon the captain of that vessel becoming aware it was adrift. Rather, the outstanding contributing causes of the collision were the ROLAND FALGOUT's total abandonment of its tow prior to docking or otherwise securing same to its ultimate destination, the tug's failure to give orders to the assist tugs to steer the barge or an order to the barge captain to drop his anchor, and the failure of the tug to communicate to all interested traffic that the barge was loose.

19. It is clear from the evidence that an overtaking situation is not present if a vessel is moored, docked or fixed. There is some dispute here as to whether an overtaking situation was present in the instant case inasmuch as the barge had basically reached her destination alongside the dock and while technically underway she was no longer making her way through water and, in addition, was on the opposite side of the river from the CHOCTAW EAGLE flotilla. However, the undersigned finds that this was an overtaking situation as the captain of the CHOCTAW EAGLE felt it necessary to secure a passing agreement with the ROLAND FALGOUT and only began to pass upon being informed by the pilot that the barge was being held against the dock; in addition, the CHOCTAW EAGLE clearly came from behind, below or down river from the ROLAND FALGOUT flotilla with the intent to pass that essentially stationary vessel. Accordingly, under the circumstances the CHOCTAW EAGLE contemplated that she was overtaking the ROLAND FALGOUT flotilla and had an absolute obligation to stay out of the way of the ROLAND FALGOUT flotilla. The CHOCTAW EAGLE, therefore, shares some fault, with the ROLAND FALGOUT, for the collision in not checking her radar regarding the whereabouts of the ROLAND FALGOUT flotilla and sounding her fog signals when the "shut-out" fog set in.

### CONCLUSIONS OF LAW

#### A. *Liability & Comparative Fault.*

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333.

---

**22.** The Court finds, however, that the MASSACHUSETTS was deficient in failing to sound distress signals and in failing to drop anchor

upon realizing that the barge was adrift in "shut-out" fog and had been abandoned by the ROLAND FALGOUT.

2. Rule 2 of the Inland Navigational Rules provides in its entirety as follows:

(a) **Exoneration**

Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b) **Departure from rules when necessary to avoid immediate danger**

In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

33 U.S.C. § 2002.

3. Rule 7 of the Inland Navigational Rules provides, in pertinent part, that "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists[,]" and further that "[p]roper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects." 33 U.S.C. § 2007(a) & (b).

4. The Inland Navigational Rule on overtaking, Rule 13, provides in general that any vessel overtaking another vessel is to keep out of the overtaken vessel's way. 33 U.S.C. § 2013(a). "A vessel shall be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam; that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the sternlight of that vessel but neither of her sidelights.... When a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly." 33 U.S.C. § 2013(b) & (c). Rule 34(h) provides that "[a] vessel that reaches agreement with another vessel in a[n] ... overtaking situation, as for example, by using the radio-telephone as prescribed by the Vessel Bridge–to–Bridge Radiotelephone Act ..., is not obliged to sound the whistle signals prescribed by this rule, but may do so. If agreement is not reached, then whistle signals shall be exchanged in a timely manner and shall prevail." 33 U.S.C. § 2034(h) (footnote omitted).

5. Rule 17 of the Inland Navigation Rules reads in pertinent part as follows:

(a) **Stand-on vessel to keep course and speed; action allowed when give-way vessel fails to take appropriate action**

(i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

(ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) **Action by stand-on vessel allowed when action by give-way vessel alone cannot avoid collision**

When, from any cause, the vessel required to keep her course and speed finds herself so close that collision can-

not be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

. . . . .

**(d) Give-way vessel not relieved of obligation to keep out of the way**

This Rule does not relieve the give-way vessel of her obligation to keep out of the way.

33 U.S.C. § 2017(a), (b) & (d).

6. Inland Navigation Rule 19 governs the conduct of vessels in restricted visibility[23] and provides that "[e]very vessel shall proceed at a safe speed adapted to the prevailing circumstances and conditions of restricted visibility. A power-driven vessel shall have her engines ready for immediate maneuver." 33 U.S.C. § 2019(b). Safe speed is described in Rule 6 as follows:

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(i) the state of visibility;

(ii) the traffic density including concentration of fishing vessels or any other vessels;

(iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

(iv) at night the presence of background light such as from shores lights or from back scatter of her own lights;

(v) the state of wind, sea, and current, and the proximity of navigational hazards;

(vi) the draft in relation to the available depth of water.

(b) Additionally, by vessels with operational radar:

(i) the characteristics, efficiency and limitations of the radar equipment;

(ii) any constraints imposed by the radar range scale in use;

(iii) the effect on radar detection of the sea state, weather, and other sources of interference;

(iv) the possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

(v) the number, location, and movement of vessels detected by radar; and

(vi) the more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

33 U.S.C. § 2006.

7. Inland Navigation Rule 35 prescribes sound signals to be given by vessels in restricted visibility and reads in pertinent part as follows:

(a) Power-driven vessels making way through the water

---

23. "The term 'restricted visibility' means any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms, or any other similar causes[.]" 33 U.S.C. § 2003(k).

A power-driven vessel [24] making way through the water shall sound at intervals of not more then 2 minutes one prolonged blast.

**(b) Power-driven vessels underway but stopped and making no way through the water**

A power-driven vessel underway but stopped and making no way through the water shall sound at intervals of not more than 2 minutes two prolonged blasts in succession with an interval of about 2 seconds between them.

**(c) Vessels not under command; vessels restricted in ability to maneuver; sailing vessels; vessels engaged in fishing; vessels engaged in towing or pushing**

A vessel not under command; [25] a vessel restricted in her ability to maneuver, whether underway or at anchor; a sailing vessel; a vessel engaged in fishing, whether underway or at anchor; and a vessel engaged in towing or pushing another vessel shall, instead of the signals prescribed in paragraphs (a) or (b) of this Rule, sound at intervals of not more than 2 minutes, three blasts in succession, namely one prolonged followed by two short blasts.

33 U.S.C. § 2035(a), (b) & (c) (footnotes added).

8. Inland Navigation Rule 37 provides that "[w]hen a vessel is in distress and requires assistance she shall use or exhibit the signals described in Annex IV to these Rules." 33 U.S.C. § 2037.

The following signals, used or exhibited either together or separately, indicate distress and need of assistance:

**(a)** A gun or other explosive signal fired at intervals of about a minute[;]

**(b)** A continuous sounding with any fog-signaling apparatus;

**(c)** Rockets or shells, throwing red stars fired one at a time at short intervals;

**(d)** A signal made by radiotelegraphy or by any other signaling method consisting of the group ...———... (SOS) in the Morse Code[;]

**(e)** A signal sent by radiotelephony consisting of the spoken word "Mayday";

**(f)** The International Code Signal of distress indicated by N.C.[;]

**(g)** A signal consisting of a square flag having above or below it a ball or anything resembling a ball;

**(h)** Flames on the vessel (as from a burning tar barrel, oil barrel, etc.);

**(i)** A rocket parachute flare or a hand flare showing a red light;

**(j)** A smoke signal giving off orange-colored smoke;

**(k)** Slowly and repeatedly raising and lowering arms outstretched to each side;

**(*l*)** The radiotelegraph alarm signal;

**(m)** The radiotelephone alarm signal;

**(n)** Signals transmitted by emergency position-indicating radio beacons;

---

**24.** "The term 'power-driven vessel' means any vessel propelled by machinery[.]" 33 U.S.C. § 2003(b).

**25.** "The term 'vessel not under command' means a vessel which through some exceptional circumstance is unable to maneuver as required by these Rules and is therefore unable to keep out of the way of another vessel[.]" 33 U.S.C. § 2003(f).

(*o*) Signals transmitted by radiocommunication systems, including survival craft radar transponders meeting the requirements of 47 CFR 80.1095[; or]

(**p**) A high intensity white light flashing at regular intervals from 50 to 70 times per minute.

33 C.F.R. § 87.1.

■■■ 9. Clearly, any violation of the Inland Navigational Rules is relevant to a determination of liability. *Dahlia Maritime Co., Ltd. v. M/S Nordic Challenger,* 1993 WL 268413 *2 (E.D.La.1993). Moreover, where, as here, there is a collision between two vessels, the rule of divided damages no longer applies. *See United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Rather, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. *Id.* at 411, 95 S.Ct. at 1715–1716 ("We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.").[26]

While the liability for damages is upon the ship or ships whose fault caused it, it is a settled rule that when a ship at the time of collision is in violation of a statutory rule intended to prevent collisions,

it is a reasonable presumption that the fault was at least a contributory cause of the damages; and the burden rests upon the ship to show not merely that her fault might not have been, or even probably was not, a cause, but that her fault could not have been a cause. *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). The *Pennsylvania* rule shifts the burden of proof as to causation to the statutory offender, but does not by itself impose liability.... When it has completed its factual findings, the court may determine that the *Pennsylvania* rule applies against either or both of the parties and both may be liable and damages may be assessed in accord with the principles of comparative negligence, as per *Reliable Transfer* [.]

*Dahlia Maritime Co., Ltd., supra,* 1993 WL 268413 at * 2; *see Atlantic Mut. Ins. Co. v. ABC Ins. Co.,* 645 F.2d 528, 531 (5th Cir.1981) ("The Rule of The Pennsylvania enjoys continued validity in collision cases. That Rule provides that when a ship violates a statutory rule intended to prevent collision, 'the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been'. Such a rule is necessary to enforce obedience to the mandate of the statute."). This Court, however, need not specifically decide in this case whether it need apply the " 'drastic and unusual presumption known as the Pennsylvania Rule,' " *Cole v. Sabine Towing & Transp. Co. Inc.,* 432 F.Supp. 144, 148 (S.D.Ala.

---

**26.** "Questions of negligence and proximate cause are treated as factual issues which cannot be disturbed on appeal unless the resolutions are clearly erroneous." *Valley Towing Service, Inc. v. S/S American Wheat, Freighters, Inc.,* 618 F.2d 341, 346 (5th Cir.1980)

(citations omitted); *see also Elenson v. SS FORTALEZA,* 1991 WL 254571 *11 (S.D.N.Y. 1991) ("The court has considerable discretion in determining the relative degrees of each party's fault in contributing to the collision.").

1977), inasmuch as there is sufficient fault to be spread among the actions or omissions of the ROLAND FALGOUT, MASSACHUSETTS and CHOCTAW EAGLE and "even without a specific, demonstrable violation of the Rules, liability can be imposed where negligence is found." *Movible Offshore, Inc. v. The M/V Wilken A. Falgout,* 471 F.2d 268, 274 (5th Cir.1973) (citations omitted).

■ 10. "A towing tug's duty has been performed and completed when she has delivered her tow to the agreed destination and has seen that it is properly moored or tied up in an apparently safe berth." *Ohio River Co. v. M/V Irene Chotin,* 238 F.Supp. 114, 118 (E.D.La.1965). In other words, a towing tug's responsibility to a barge "is a continuing one which terminates only when the tow is safely anchored at its ultimate destination." *S.C. Loveland, Inc. v. East West Towing, Inc.,* 415 F.Supp. 596, 604 (S.D.Fla.1976) (citations omitted), *aff'd,* 608 F.2d 160 (5th Cir.1979), *cert. denied sub nom. St. Paul Mercury Ins. Co. v. East West Towing, Inc.,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *see also Pasco Marketing, Inc. v. Taylor Towing Service, Inc.,* 411 F.Supp. 808, 815 (E.D.Mo.1976) (" 'The tug[']s task, however, is completed and the tower is discharged from further responsibility when the tug has brought her tow to the place of final destination, and moored or landed her safely, in a berth apparently safe, or as safe as conditions permit, and, if damage occurs thereafter, the tug is not responsible, since she is not under a duty to stand by for protection of the tug thereafter.' "), *aff'd in part and rev'd in part,* 554 F.2d 808 (8th Cir.1977).[27] Moreover, the Fifth Circuit has held that "[w]hen a drifting vessel causes damage, an inference arises as a matter of law that the vessel was adrift through negligence[,]" and that "[t]he custodian[28] of the drifting vessel bears the burden of disproving fault by a preponderance of the evidence." *James v. River Parishes Co., Inc.,* 686 F.2d 1129, 1132–1133 (5th Cir.1982) (footnote added).

■ 11. Viewing the ultimate responsibility of the tug towing the barge MASSACHUSETTS, that is, the ROLAND FALGOUT, in the context of Inland Navigational Rule 2, *see Elenson, supra,* 1991 WL 254571, at *4 ("Rule 2 has been described as requiring ... vessels to observe general standards of good seamanship, observance of the 'precaution which may be required by the ordinary practice of seamen.' Thus liability may be imposed for negligence even when no violation of the rules is found. Rote observ-

**27.** In the appellate decision, a panel of the Eighth Circuit Court of Appeals made the following pertinent observations:

A tug, of course, would be at fault if it inadequately secured a barge. This would be so whether it was performing under a towage contract or under a bailment. In this context, a tug using a cable which it knew was defective or weak, and regardless of who owned it, would be responsible for its tow going adrift just as if it had failed to tie or secure the tow. The recognized rule has long been that a tug is bound to properly moor and make fast an unmanned barge it delivers, and that drifting which occurs within a short time thereafter, presumptively establishes fault on the part of the mooring vessel. When this presumption operates the duty of producing evidence shifts to the mooring vessel to show that it exercised the due care required of it.

554 F.2d at 811 (internal citations omitted).

**28.** In this instance, the ROLAND FALGOUT was the custodian of the MASSACHUSETTS inasmuch as the former vessel was in charge of docking the MASSACHUSETTS at the Atlantic Marine shipyard.

ance of a rule will not necessarily excuse responsibility for a collision. Even a vessel with the right of way must take action to avoid a collision if it has the opportunity."), it is clear to the Court that the ROLAND FALGOUT must shoulder the majority of the blame for the collision between the MASSACHUSETTS and the barge Crowley 407 and the resulting damages, notwithstanding Gray's status as a compulsory or voluntary bar pilot.[29]

29. The Court concludes that Gray's status was that of a voluntary pilot as opposed to a compulsory pilot, as counsel for the ROLAND FALGOUT has made no showing that Gray was in fact a compulsory pilot. *Compare* Ala. Code § 33–4–52 ("All vessels, whether sail, steam or propelled by any other motive power, including vessels, barges and rafts in tow, engaged in coastwise trade, including those engaged in trade or plying upon the navigable rivers of the State of Alabama, and all vessels exempt under the laws, rules or regulations of the government of the United States shall be exempt from payment of any pilotage fee whatsoever and shall not be required to have the services of a pilot in crossing the outer bar of Mobile Bay or navigating the waters of said bay or other navigable waters of the State of Alabama.") *with* Ala. Code § 33–4–54 ("All steam or sail vessels crossing the outer bar of Mobile Bay, except those exempt under this chapter, shall be conducted, controlled or navigated by a pilot licensed by or under authority of the laws of the State of Alabama, if the services of a pilot are seasonably tendered or are seasonably available and shall be required to pay the full amount of pilotage now provided by law."). Accordingly, Falgout Brothers, Inc.'s citation to *Avondale, Inc. v. International Marine Carriers, Inc.*, 1992 WL 124817 *4 (E.D.La.1992), *judgment rev'd*, 15 F.3d 489 (5th Cir.1994), for the proposition that "the owner and master of a ship cannot be held liable *in personam* for the negligence of a compulsory pilot, because the compulsory pilot is not the servant of the owner and master[,]" provides no aid to this defendant's attempts to avoid liability. Moreover, it is clear that "[t]he rule that in actions at common law the shipowner is not liable for injuries inflicted exclusively by the negligence of a compulsory pilot does not exempt the shipowner from liability where negligence of the vessel's captain proximately contributed to the injury." *Kingfisher Shipping Co., Ltd. v. M/V Klarendon*, 651 F.Supp. 204, 207 (S.D.Tx.1986) (citations omitted); *see also Jure v. United Fruit Co.*, 6 F.2d 6, 6–7 (5th Cir.1925) ("The authority of the master of a vessel is not in complete abeyance while a pilot, who is required by law to be accepted, is in discharge of his functions. *The China*, 74 U.S. 53, 7 Wall. 53, 19 L.Ed. 67. With reference to such a situation the following was said in the opinion in that case: 'It is the duty of the master to interfere in cases of the pilot's intoxication or manifest incapacity, in cases of danger which he does not foresee, and in cases of great necessity. The master has the same power to displace the pilot that he has to remove any subordinate officer of the vessel. He may exercise it, or not, according to his discretion.' The rule stated in the case of *Homer Ramsdell Co. v. La Com. Gen. Trans.*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155, to the effect that in actions at common law the shipowner is not liable for injuries inflicted exclusively by negligence of a pilot accepted by a vessel compulsorily, does not exempt the shipowner from liability where negligence of the vessel's master proximately contributed to the injury complained of in such action."); *Navegacion Castro Riva, S.A. of Panama v. The Nordholm*, 178 F.Supp. 736, 740 (E.D.La. 1959) ("But the vessel cannot be abandoned to the pilot. The responsibility of the crew persists."), *judgment aff'd*, 287 F.2d 398 (5th Cir.1961); *see Avondale Industries, Inc. v. International Marine Carriers, Inc.*, 15 F.3d 489, 493 (5th Cir.1994) ("[W]e are convinced that the district court's finding that no act or omission on the part of Captain Rivera or his crew contributed to the accident is clearly erroneous."); *Mount Washington Tanker Co. v. Wahyuen Shipping, Inc.*, 833 F.2d 1541, 1542 (11th Cir.1987) ("When the moving vessel is under the control of a compulsory pilot, the owner may escape liability 'only where the pilot is actually in charge of the vessel, and solely in fault.' ... An owner's motion for summary judgment will not be granted simply because the owner submits evidence to establish that the instrumentalities under the owner's control did not contribute to the cause of the accident. The owner must instead rebut the presumption against the moving vessel by demonstrating that the compul-

Clearly, as established by the evidence, the captain of the ROLAND FALGOUT was fully cognizant of his responsibility to dock the MASSACHUSETTS at the Atlantic Marine shipyard and to this end he was preparing his tug to take the final step in docking the barge by first releasing the towing hawser and then repositioning the tug to push the barge into the slip.[30] Upon becoming aware that he had lost sight of his tow in the "shut-out" fog and was unable to reposition his tug for completion of the docking, and hearing nothing from the pilot [31] or anyone until the barge captain informed everyone that he had lost sight of the ROLAND FALGOUT, it was up to the captain of the ROLAND FALGOUT, in furtherance of his ultimate duty to see that his tow is safely docked and moored, to take all steps necessary to keep his tow out of harm's way. To this end, given the special circumstances facing him, the captain of the ROLAND FALGOUT should have ordered the barge captain to immediately drop anchor and/or otherwise should have given orders to the assist tugs to hold the barge in place. Moreover, Captain Gisclair should have notified all river traffic that his barge was loose. Here, the captain of the ROLAND FALGOUT totally abandoned the MASSACHUSETTS and all responsibility he had to see that vessel safely docked at the Atlantic Marine shipyard. Given the total abandonment of the MASSACHUSETTS by the ROLAND FALGOUT, this Court finds the owners of the ROLAND FALGOUT to be 80% responsible for the collision between the MASSACHUSETTS and the barge Crowley 407.

 12. While the ROLAND FALGOUT, and Falgout Brothers, Inc., are 80% at fault for the collision and resulting damage, two other parties are each 10% at fault. However, neither of these parties are any of the Crescent Towing tugs which were assisting in the docking of the MASSACHUSETTS. It is clear from the testimony of all pilots and all navigational experts in this case that the Crescent Towing tugs were simply along for the ride until given specific orders regarding what actions or maneuvers to take to assist the MASSACHUSETTS in docking or avoiding collision. Assist tugs are to follow the orders of others rather than taking action on their own accord and therefore, the Crescent Towing tugs at issue here bear none of the fault for the collision or resulting damage. Accordingly, judgment is entered in favor of Crescent Towing & Salvage Co., Inc. in this case.

 13. The other parties in this case who each bear 10% of the fault for the collision and resulting damages to the MASSACHUSETTS and the barge Crow-

---

sory pilot's negligence is the sole cause of the collision."). Even assuming the negligence of Captain Gray in abandoning his pilotage his negligence does not absolve the ROLAND FALGOUT and her captain's subsequent negligence in failing to take charge, in furtherance of the responsibility to dock the MASSACHUSETTS, and order the barge to drop its anchor or give orders to the assist tugs to halt the drifting of the barge.

30. At all times, the captain of the ROLAND FALGOUT was in control of the wheel to steer the tug; the pilot never touched the wheel but simply acted as an advisor to the tug captain.

31. *Cf. Avondale, Inc., supra,* 1992 WL 124817 * 4 ("[W]here the master and crew of the vessel being piloted contribute to the negligence, or where the pilot is manifestly incompetent and the master fails to interfere with, warn, or even take over and relieve the pilot, the vessel owner may have *in personam* liability.").

ley 407 are Moran, as owner of the MASSACHUSETTS, and Double Eagle Marine, Inc., as owner of the CHOCTAW EAGLE. The MASSACHUSETTS necessarily must bear a modicum of fault for the collision due to its failure to sound distress signals and/or drop anchor once it became clear that the MASSACHUSETTS was adrift in "shut-out" fog and had been abandoned by the ROLAND FALGOUT. Though the accident happened only some five minutes after the captain of the MASSACHUSETTS becoming aware that he could not see the ROLAND FALGOUT and the captain attempted to gain some control with orders to the assist tugs, in light of the captain's admission that the barge sounded no distress signals and that the barge could have dropped anchor and one expert's testimony that the dropping of anchor could have been accomplished in a minute's time, the MASSACHUSETTS must bear some responsibility for the collision. However, that responsibility will not be more than 10% since the collision happened so quickly and the MASSACHUSETTS captain had never before dropped anchor without being given that order from a tug captain.

▆▆▆▆ 14. Focusing on the conduct of the CHOCTAW EAGLE, the Court finds that vessel's actions or inactions deficient in a number of regards. The Court's first observation is that the CHOCTAW EAGLE was in fact overtaking the ROLAND FALGOUT flotilla, notwithstanding the testimony of Warren Norville to the contrary. The Court finds an overtaking situation both because the ROLAND FALGOUT flotilla was underway the entire time, *see Allied Chemical Corp. v.*

*Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1051 (5th Cir.1981) (" 'A vessel lying in a river with her stem against the bank and holding herself against the current by using her engines is underway.' "), though supposedly against the Atlantic Marine dock, and because the captain of the CHOCTAW EAGLE made a passing agreement with the pilot of the ROLAND FALGOUT thereby treating the situation as an overtaking. "Generally, when an overtaking vessel strikes the vessel it is passing, the overtaking vessel is presumed to be at fault, and must prove that it was free of fault in the collision." *Cole, supra,* 432 F.Supp. at 147, citing *Liner v. Crewboat Mr. Lucky,* 275 F.Supp. 230 (E.D.La. 1967). In other words, an overtaking vessel bears the "burden of proving herself free of fault." *The Percheron v. Alabama Transit Co.,* 246 F.2d 135, 138 (5th Cir. 1957). The CHOCTAW EAGLE cannot prove herself free from all fault inasmuch as when the "shut-out" fog set in the CHOCTAW EAGLE should have kept a vigilant watch on her radar and also should have begun sounding her fog signals, particularly in light of her captain's admission that circumstances involving the navigation of vessels change at a moment's notice. Moreover, the CHOCTAW EAGLE should have at all times kept in radio communication with the ROLAND FALGOUT regarding that flotilla's position relative to the location and position of its flotilla. The CHOCTAW EAGLE's failure to take such actions makes her 10% responsible for the collision between the MASSACHUSETTS and the barge Crowley 407. In other words, these omissions on the part of the captain and crew of the CHOCTAW EAGLE contributed to the accident.[32]

---

**32.** The Court specifically **DENIES** the motion to dismiss for lack of subject matter jurisdiction (Doc. 121; *see also* Doc. 122) filed by defendants Falgout Brothers, Inc. and Double

## B. *Damages.*

15. Having determined the relative fault, if any, of the parties defendant, the undersigned considers the issue of damages and other costs and the proper division of same.

16. "A vessel owner is entitled to recover the cost of reasonable and necessary repairs to its vessel." *Dahlia Maritime Co., Ltd., supra,* 1993 WL 268413 at *7, citing *Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA,* 761 F.2d 229 (5th Cir.1985). In addition, a vessel owner is also entitled to recover "all other expenses shown to have been incurred necessarily by reason of the accident[.]" *Gulf Oil Co. v. Panama Canal Co.,* 481 F.2d 561, 570 (5th Cir.1973). Certainly one such expense would be the cost of surveying the damage to the vessels involved in the collision. *Bunge Corp. v. Freeport Marine Repair, Inc.,* 240 F.3d 919, 927 (11th Cir.2001) (cost of damage survey and repair estimate fees are recoverable); *Gulf Oil Co.,* 481 F.2d at 572 (one marine survey allowed); *Marine Office of America Corp. v. M/V Vulcan,* 891 F.Supp. 278, 289 (E.D.La.1995) ("Recoverable costs include surveyors ...."). Finally, prejudgment interest is allowable. *Mobil Oil Corp. v. Tug Pensacola,* 472 F.2d 1175, 1176 (5th Cir.1973) ("[T]he general rule in admiralty is to award interest from the date of collision except where peculiar circumstances warrant awards only from the date of judgment."); *Marine Office of America Corp.,* 891 F.Supp. at 290 ("Prejudgment interest shall be awarded[.]"); *see also Gulf Oil Corp., supra,* 481 F.2d at 570 ("Interest is treated as a part of the loss itself and not just for the delay in payment of the decree.").

17. None of the parties dispute the reasonableness of the repair costs incurred by plaintiff Crowley American Transport, Inc. for damage done to the barge Crowley 407 in the collision with the MASSACHUSETTS. Therefore, plaintiff is entitled to recover its repair costs of $35,967.00, plus prejudgment interest of 9.11% on the repair costs since March 18, 1999. Additionally, plaintiff is entitled to recover the costs of the surveyor's fees, that is, $1,156.00. Defendant Falgout Brothers, Inc. must bear eighty percent (80%) of these combined costs while Moran and Double Eagle Marine, Inc. each much bear ten percent (10%) of these combined costs.

18. Objection is made to the repair costs to the barge MASSACHUSETTS, not only respecting the cost per pound of steel used by the repairer, Atlantic Marine, but also because included within the repair costs were repairs to a preexisting dimple and to an area which was supposed to be re-surveyed following the removal of ballast water to determine if in fact such damage was caused by the collision. The Court agrees with Falgout Brothers, Inc. and Double Eagle Marine, Inc. that Moran cannot recover the costs of repairs to the area which was supposed to be re-surveyed, particularly in light of the testimony that there was evidence of some rusting in this area. The undersigned cannot fathom how rust could appear at the site of collision damage on the very day of the collision and therefore, the repair costs to this area are not recoverable by Moran. Because the repair costs for the areas of damage were not itemized the Court determines that it is reasonable that repair costs totally $12,312.00 were

Eagle Marine, Inc. The factual findings contained herein clearly establish the existence of subject matter jurisdiction.

incurred in this area of the MASSACHU-SETTS.[33] The Court cannot agree with any other objection to the cost of repairs, however, in part because the ABS required Moran to repair the preexisting dimple when the other repairs were made to the damage that clearly resulted from the collision. Moreover, this Court does not find fault with Moran's failure to get other bids across the river, like from Bender Shipbuilding, both because there was no showing that Bender would have charged less for the steel used to repair the MASSA-CHUSETTS and also because had Moran been able to get a lower bid from Bender, *see Dahlia Maritime Co., Ltd., supra,* 1993 WL 268413, at * 10 ("Based on an injured party's duty to mitigate damages, the lowest bid for work should be used."), same would have necessitated an analysis and compensation of Moran's loss of the use of her vessel and/or lost profits, *see id.* at *8 (recognizing entitlement for loss of income occasioned by the collision); *Gulf Oil Co., supra,* 481 F.2d at 570 (losses not confined to out-of-pocket expenses, like repair bills, but also include the loss of the use of the vessel). Moreover, no objection was made to Crowley making repairs at the same place the 407 barge was scheduled for general maintenance and therefore, this Court eschews any attack upon Moran's actions in doing just what Crowley did in this regard.

19. In light of the foregoing, Moran is entitled to recover $44,310.00 for the repairs to the MASSACHUSETTS and pre-

judgment interest, pursuant to 28 U.S.C. § 1961, on this amount. In addition, Moran is entitled to recover the cost of Pritchett's surveying fees, that is, $1,556.37. Eighty percent of this combined amount is to be born by Falgout Brothers, Inc., ten percent by Double Eagle Marine, Inc., and ten percent by Moran.

## *CONCLUSION*

The Court holds that plaintiff Crowley American Transport, Inc., is entitled to recover from Falgout Brothers, Inc., Double Eagle Marine, Inc., and Moran, repair costs of $35,967.00, together with prejudgment interest of 9.11% on this amount from March 18, 1999 until paid, and surveyor's fees in the amount of $1,156.00. In addition, Moran is entitled to recover from Falgout Brothers, Inc. and Double Eagle Marine, Inc. ninety percent (90%) of its repair costs of $44,310.00, together with interest from March 18, 1999 until paid, at the rate provided for under 28 U.S.C. § 1961, and ninety percent of the fees paid to the surveyor ($1,556.37).

## *JUDGMENT*

In accordance with the memorandum opinion and order entered on this date, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that plaintiff recover from defendants Falgout Brothers, Inc., Double Eagle Marine, Inc., Moran Towing of Texas, Inc., and Petroleum Transport Corp. (the latter two corporations hereinafter be-

---

**33.** This amount is derived from the testimony of Chris LaBure and Claude Pritchett. A total of 5,657 pounds of steel was used to repair all three areas of damage and of that total, 3,574 pounds of steel were used to repair the twenty by six foot area and 357 pounds of steel were used to repair the preexisting dimple. Adding these two amounts together and multiplying same by $10.00 renders a total of $39,310.00.

Taking this amount and adding to it $5,000.00 for staging, testing, etc., as suggested by La-Bure, renders a total repair cost of $44,310.00. Subtracting $44,310.00 from $56,622.00 renders a total of $12,312.00 attributable to repair the eight foot by four foot area of damage that was not subject to a resurvey and is therefore, not compensable.

ing referred to collectively as "Moran") repair costs of $35,967.00, together with interest of 9.11% on this amount from March 18, 1999 until paid, and survey fees in the amount of $1,156.00. Eighty percent of this combined amount is to be paid by Falgout Brothers, Inc., ten percent by Double Eagle Marine, Inc., and ten percent by Moran. Costs incurred by plaintiff in this action are taxed to Falgout Brothers, Inc., Double Eagle Marine, Inc., and Moran in their proportionate shares.

It is further **ORDERED, ADJUDGED,** and **DECREED** that Moran recover of Falgout Brothers, Inc. and Double Eagle Marine, Inc. ninety percent of their compensable repair costs of $44,310.oo, together with interest from march 18, 1999 until paid, at the rate provided for under 28 U.S.C. § 1961, and ninety percent of the fees paid to the surveyor ($1,556.37), in their proportionate shares. Ninety percent of the costs incurred by Moran in this action are taxed to Falgout Brothers, Inc. and Double Eagle Marine, Inc. in their proportionate shares.

Finally, it is **ORDERED, ADJUDGED,** and **DECREED** that judgment be entered in favor of defendant Crescent Towing & Salvage Co., Inc, in this Case. Costs incurred by Crescent in defending this action are taxed to plaintiff Crowley American Transport, Inc.